# Exhibit 3

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

DAVID ANTHONY COLEMAN, JR.; ANNETTE
COLEMAN and DAVID ANTHONY COLEMAN III,

Plaintiffs,

vs.

A. C. DELCO, ALLIED SIGNAL CORPORATION
successor to BENDIX CORPORATION, AMERICAN
BRAKE AND BLOCK COMPANY, BORG WARNER
CORPORATION, CHRYSLER CORPORATION, DANA
CORPORATION, FORD MOTOR COMPANY, FOREST
CITY AUTO PARTS, GENERAL MOTORS CORPORATION,
GRIZZLY FRICTION PRODUCTS DIVISION OF NUTURN
CORPORATION, MAREMONT CORPORATION, NAPA
AUTO PARTS, NISSAN CR CORPORATION, PNEUMO
ABEX CORPORATION, TOYOTA MOTOR SALES USA, INC.,
and WAGNER ELECTRIC SALES CORP.,

Defendants.



PLAINTIFF'S
EXHIBIT
CHR - 5093

Case No. CV 408170
Judge Harry Hanna

## PLAINTIFFS' FIRST MASTER SET OF INTERROGATORIES PROPOUNDED TO ALL ABOVE NAMED DEFENDANTS

COMES NOW DaimlerChrysler Corporation formerly known as Chrysler Corporation, one

of the Defendants in the above-styled and numbered cause (hereinafter Chrysler or Defendant), and

makes the following Objections and Responses to Plaintiffs' Master Set of Interrogatories

Propounded to Defendant DaimlerChrysler Corporation in accordance with the Ohio Civil Rules.

-1-

I.

## OBJECTIONS

These responses are based upon facts known or believed by Chrysler at the time of answering these interrogatories and requests for production. Much of the information requested dates back many years and is difficult or impossible to reconstruct or retrieve. These discovery responses are made pursuant to a reasonable and due diligent investigation and search for the information requested. Chrysler reserves the right to amend these responses if new or additional information becomes available to it.

Chrysler further objects to the definitions and instructions prepared by Plaintiffs' counsel in that they are overly broad, vague, ambiguous, and are not reasonably limited in scope or time. Plaintiffs' definitions and instructions are overly burdensome, overreaching, and sought merely for purposes of harassment and, as such, Chrysler objects to all those definitions contained within Plaintiffs' discovery to the extent they and Plaintiffs' instructions are inconsistent with the normal and customary usage of words pursuant to the Ohio Civil Rules. Chrysler further objects to Plaintiffs' definitions and instructions to the extent they seek to expand the duty to object and seek intrusion into the attorney-client privilege, work product privilege, witness statement privilege, other federal and state law privileges, party communications privilege and consulting expert privilege contained in Ohio Civil Rules. Materials to be produced will be produced according to the provisions of the Ohio Civil Rules, and Chrysler objects to Plaintiffs' instructions to the contrary. Chrysler further objects to Plaintiffs' instructions with regard to claimed objections since these instructions are not required by, nor are consistent with, the Ohio Civil Rules and Chrysler will comply with the Ohio Civil Rules with regard to its objections and supplementation.

-2-

II.

Chrysler further objects to Plaintiffs' interrogatories and request for production as a whole to the extent that there is no definition for the term "asbestos." Plaintiffs' counsel apparently seeks to utilize the generic term rather than specify the actual substance complained about with regard to Chrysler. Chrysler's vehicles at times utilized a specific type of asbestos, chrysotile, in its friction products and to the extent that the requests for production or interrogatories are directed to a generic use of the term "asbestos," Chrysler objects to that term as being intentionally non-specific/global, overly broad, vague and ambiguous. Such information using this generic term is otherwise irrelevant, overly broad, vague and ambiguous as well as being outside the scope of permissible discovery and seeking information privileged from discovery under the attorney work product and attorney-client privilege. To the extent the responses are made with regard to these interrogatories and requests for production, Chrysler will respond with regard to the term "asbestos" referring to the chrysotile material utilized by Chrysler.

Because "predecessor" and "subsidiary" are not defined or specifically identified, it is unclear about which entities Plaintiffs are inquiring. To provide such information would require a nationwide search unlimited by time, location, or type of information, and is thus over broad and unduly burdensome.

III.

Those objections set forth herein are hereby applied to all responses set forth in each specific interrogatory and request for production as if fully set forth in each particular interrogatory and request for production.

-3-

IV.

To the extent that discoverable items are produced to Plaintiff, any production for copying and inspection of such items will be made at the offices of Reminger & Reminger, 113 St. Clair, Suite 700, Cleveland, Ohio 44114, at a mutually agreeable time between the parties pursuant to the Ohio Civil Rules.

V.

Chrysler objects to the number of Interrogatories contained within the Master Interrogatories set forth herein. Pursuant to the Ohio Civil Rules, Plaintiffs' Interrogatories require responses well in excess of the interrogatories provided for under the Ohio Civil Rules. Discovery is ongoing and Chrysler will supplement as appropriate.

VI.

These answers to interrogatories do not apply to American Motors Corporation.

VII.

Chrysler understands that Plaintiffs allege injuries due to exposure to asbestos from automotive friction materials. Chrysler's responses to these interrogatories specifically address automotive friction materials.

Subject to those objections set forth and without waiving same, Chrysler responds as follows:

CORPORATE NAME

1.    For each Interrogatory below, please state the name and last known address of each person answering it, including whether he/she is employed by Defendant and if employed by Defendant include job title, length of time employed by Defendant and a year by year list of all other positions, titles, or jobs held when working for Defendant.

ANSWER: The responses to these interrogatories are corporate responses, prepared with the assistance of counsel and based on a variety of sources, including documents and personal recollections. The person signing these responses on behalf of Chrysler is a person authorized by the corporation to subscribe to the responses on its behalf.

1.1    Please identify all documents used, related to, or referred to in connection with the preparation of or answers to these Interrogatories and state the number of the Interrogatory and its subpart to each such document.

ANSWER: Chrysler's responses to these interrogatories have come from a number of sources and to the extent that they came from documents, said documents will be produced at a mutually agreeable time and place.

2.    Please state whether or not Defendant is a corporation. If so, please state:

(a)    Your correct corporate name;

(b)    the state of your incorporation;

(c)    The address of your principal place of business;

(d)    Your registered agent for service in the state of Ohio;

(e)    For each Defendant claiming that this Court lacks personal jurisdiction, list year by year the total amount of income received by the Defendant from entities in Ohio, any and all years that Defendant, as defined, has been licensed to do business in Ohio, and any real property owned at any time by Defendant or its present or past subsidiaries.

ANSWER: DaimlerChrysler Corporation, 1000 Chrysler Drive, Auburn Hills, Michigan. Chrysler is incorporated in Delaware. C.T. Corporation, 1300 9th Street, Cleveland, Ohio 44114. Chrysler does not contest jurisdiction in Ohio.

      3.    State Defendant's complete corporate or business history, including dates of incorporation, mergers, consolidations, reincorporations, and the like. Also provide historical information regarding all predecessor, prior names, asset purchase, acquisitions or spin-offs. In addition:

      a.    if defendant or any of its predecessors or subsidiaries at any time purchased, assumed, or in any other manner acquired ANY of the assets and/or liabilities of any corporation or entity at any prior time engaged in any aspect of the placing of asbestos containing products into the stream of commerce or the insuring of asbestos related risks, then please state the following as to each acquisition;

      b.    the name or description of each corporation, entity or assets acquired by Defendant, that entity's state of incorporation and principal place of business, its date of incorporation, and the name of Defendant at the time of acquisition;

      c.    the manner by which each such corporation, entity or interest therein, was acquired (e.g., merger, consolidation, change of name, stock sale, transfer or purchase of assets or product line);

      d.    the date of each such acquisition;

      e.    the state in which each such acquisition was effected;

-6-

f.      the state law governing each such acquisition if specified by contract;

g.      whether Defendant became legally responsible for the past torts of each such corporation or entity;

h.      identify each document reflecting or related to the history and/or transaction(s) set forth in answer to this Interrogatory.

ANSWER: Chrysler Corporation was incorporated under the laws of the State of Delaware on March 9, 1986, as part of a corporate reorganization of the Chrysler group of companies in which Chrysler Motor Corporation (formerly Chrysler Corporation, incorporated in Delaware in 1925) became a wholly owned, indirect subsidiary of Chrysler Corporation (formerly Chrysler Holding Corporation).   The corporate reorganization was consummated on June 1, 1986.   Effective December 31, 1989, Chrysler Motor Corporation merged into Chrysler Corporation.  On November 17, 1998, Chrysler Corporation merged with Daimler Benz A.G. to become DaimlerChrysler A.G.

4.      Please state whether or not the Defendant has purchased, assumed, or in any other manner acquired any of the assets and/or liabilities of any corporation or entity (such corporations or entities being limited to those engaged in the mining, selling, manufacturing, marketing or distribution of asbestos-containing products.)  If so, please state the following:

a.      the name or description of each corporation, entity or assets acquired by Defendant, its state of incorporation and principal place of business, its date of incorporation, and the name of Defendant at the time of acquisition;

b.      the manner by which each such corporation, entity, or interest therein, was acquired (e.g. merger, consolidation, change of name, stock sale, transfer or purchase of assets

or product line);

c.    the date of each such acquisition;

d.    the state in which each such acquisition if specified by contract;

f.    whether Defendant became legally responsible for the past torts of each such

corporation or entity;

g.    whether the acquisition concerned asbestos-containing products.

ANSWER: Chrysler has not purchased, reorganized, or merged into any company involved in the

manufacture of raw asbestos or insulation products.    However, Chrysler purchased Briggs

Manufacturing Company in the 1950s. Furthermore, through stock transactions, Chrysler has had

a controlling interest in Lamborghini and Maserati. In the 1980s, Chrysler acquired American Motors

Corporation. Further, through various transactions at times during the period from 1930 to 1985,

Chrysler has had an interest in foreign automakers, whose vehicles also may have been equipped with

asbestos containing automotive brake and/or clutch parts. Some of the vehicles made by foreign

makers in which Chrysler had an interest may have been placed in the stream of commerce in the

United States.

Chrysler purchased an interest in the Rootes Group of Great Britain in the early 1960s, which

increased to 83% by the time Chrysler sold its holdings in 1978 (Rootes was at that time know as

Chrysler United Kingdom). Some Rootes cars were imported by Chrysler into the United States and

sold throughout Chrysler dealers, including the Sunbeam Tiger and the Plymouth Cricket.

Chrysler purchased a 25% interest in Simca of France in 1958, obtained controlling interest

(69%) by 1964, which increased to 77% by the time Chrysler sold all its Simca holdings in 1978

(Simca was at that time known as Chrysler France). Some Simca cars were imported by Chrysler into

the United States beginning in 1958 and sold through Chrysler dealers at that time.

Chrysler acquired a 15% interest in Mitsubishi of Japan in 1971, with further acquisitions of 10% in 1972 and another 10% in 1973. Chrysler sold its Mitsubishi holdings in 1991. During the period through 1985, some Mitsubishi vehicles were imported by Chrysler into the United States and sold through Chrysler dealers, including Dodge and Plymouth Colt and Colt Vista models, Plymouth Arrow, Plymouth Conquest, and Dodge Ram 50 compact pickup trucks.

In 1998, Chrysler merged with Daimler Benz A.G.


4.1    For each corporation, other than the answering defendant (the entity), that has at any time in the past been involved in the placing of asbestos containing products into the stream of commerce for which officers of the answering defendant's corporation have also served as officers, directors or served in any managerial position while employed by the answering defendant, state:

a.    the name of the entity involved in the placing of asbestos products into the stream of commerce;

b.    the manner in which the entity was involved in the placing of asbestos containing products into the stream of commerce (i.e. mining, milling, manufacturing, distributing, installing, rebranding, etc.);

c.    the specific products placed into the stream of commerce by the entity year by year and by brand or trade name;

d.    the name, position and a brief description of the responsibilities of the person or persons serving the answering defendant and the entity simultaneously including the positions held with the entity and with the answering defendant.

ANSWER: This interrogatory is overly burdensome as it would be impossible for Chrysler to identify every officer or director of Chrysler since 1925 and then identify if they were an officer or director of an other corporation that placed asbestos-containing products into the stream of commerce. Further answering, it has been Chrysler's practice not to allow its officers or directors to serve as board members of its suppliers.

## EVER SELL ASBESTOS

5.    Has Defendant ever engaged in the mining, manufacturing, selling, marketing, installation or distribution of asbestos-containing products (including equipment of any kind containing asbestos in any form)? If so, please state the following;

   (a)    The name of the company engaged in the activity (whether it is Defendant, Defendant's predecessor, of Defendant's subsidiary);

   (b)    As to each product mined, manufactured, sold, marketed, installed or distributed, please state the following:

      1.    The trade or brand name.

      2.    Its identification number (model, serial number, etc.).

      3.    The time period it was manufactured, mined, marketed, distributed or sold.

      4.    Its physical description including color, general composition, and form.

      5.    A detailed description of its intended use and purpose.

      6.    A detailed description of the type package in which it was sold, listing the dates of each type of package used, a physical description of the package, and a description of any printed material or trademarks that appeared

-10-

thereon.,

7. The percent of asbestos which it contained.

8. The percent of asbestos by asbestos type (amosite, crocidolite, tremolite, anthophyllite).

(c) The time period during which each of these products were on the market;

(d) The material components/ingredients of each such product, giving specific or approximate percentage both by weight and by volume of each material component/ingredient (this interrogatory is not limited to the asbestos component of the product but seeks information as the nature, weight and volume of non-asbestos ingredients, as well) of each such product;

(e) How each of these asbestos-containing product can be distinguished from those competitors;

(f) A description of the physical appearance of such product;

(g) A detailed description of the intended uses.

ANSWER: Chrysler understands that Plaintiffs allege they were exposed to asbestos from automotive friction products, and Chrysler's response to this interrogatory is limited to those products. Chrysler objects to this interrogatory to the extent it is over broad, unduly burdensome seeks information irrelevant to this litigation and seeks information not likely to lead to the discovery of admissible evidence to the extent it seeks information about products other than automotive friction materials.

Chrysler manufactured automobiles and light trucks that have included asbestos-containing products including brake linings, clutch plates and transmission bands. Original equipment parts were distributed in new Chrysler, Plymouth, DeSoto and Dodge automobiles.

-11-

Chrysler sold and distributed asbestos-containing automotive brake and clutch replacement parts under the Mopar, CycleWeld and/or CycleBond trade names to independent warehouse distributors and authorized dealers.

From the time Chrysler began making automobiles in 1925, brakes contained some asbestos. Brake linings were manufactured at the Trenton Chemical Plant for use in its automobiles beginning in 1959 and ending in 1988.

Chrysler never mined, milled, manufactured, imported, processed or marketed raw asbestos fiber or insulating materials. No documents have been located reflecting that Chrysler ever sold raw asbestos. Chrysler purchased chrysotile asbestos fiber from Asbestos Corporation, Limited, 830 Mooney Street, Bentford Mines, Quebec, Canada G665 1; Carey Canadian, P.O. Box 190, East Braughton Station PQ Canada GON1HO; Johns-Manville, P.O. Box 5 108, Ken Caryl Ranch, Denver, Colorado 80217, Lake Asbestos, International Fibers, Union Carbide Materials Division, A.T. Callas, Alma Products and Boehle Chemical, Inc.

Brake linings are arc-shaped rock-hard material that press against a turning drum to slow or stop an automobile. They are thin, approximately .25 inches. Linings are rigid because they are made of a hard-baked phenolic resin, which is a plastic that remains solid and rigid even when subjected to extreme temperatures such as those generated inside a wheel drum during the braking process. In the manufacturing process, the phenolic resin has a thick dough-like consistency. A number of ingredients, including about 50% chrysotile asbestos are mixed into that dough-like matrix. The mix goes into molds which are baked at high temperatures to form a product hard enough to withstand the friction and temperature extremes generated when stopping a car. Those forces destroy or change the form of the chrysotile asbestos as the lining is consumed over thousands of miles of usage. With

-12-

respect to physical appearance, brake linings were solid tan or gray slate. Chrysler placed indented identification marks on its brake linings. Each brake lining was marked on its edge with a letter designation indicating the name of the manufacturer of the lining, the chemical composition of the lining (indicated by a combination of letters: "FE" or "EE"), followed by numbers indicating the friction level of the lining when normal and when hot, and four digits indicating calendaring for date of manufacture. As a new product, the finished materials are date coded and identified by manufacturer. After the product is used, it eventually becomes worn and therefore indistinguishable from other manufacturer's products. The Chrysler logo or emblem was stamped on the brake shoes and brake support plate produced by Chrysler. For identification purposes, color indentation appeared on the lining perpendicular to the friction surface. Chrysler has not located documentation sufficient to allow it to describe markings on parts obtained from outside suppliers.

Chrysler stopped using asbestos in the brake linings manufactured at Trenton in 1988. For all times pertinent to this litigation, aside from the brake products made at Trenton Chemical, Chrysler purchased brake products from suppliers. Chrysler does not have specific information regarding the specific composition of the asbestos-containing friction products purchased from outside suppliers. Chrysler objects to the relevance of sales after the years that plaintiff allegedly worked with or around these products as such inquiry is overly broad. Without waiving these objections, presently Chrysler does not manufacture any vehicles that contain asbestos containing friction products.

Chrysler has purchased asbestos-containing brakes from Abex Corp. (American Brake Block), Bendix Corp. (Allied Signal), Friction Material Division, Raybestos, Raybestos-Manhattan, Johns-Manville, Nuturn, Delphi, Galfer, Valeo Friction Development Products, Kelsey Hayes, Marshall, Delco-Moraine and Ferodo. Brake parts have been sold by Chrysler under the trade names Mopar,

CycleWeld, and CycleBond.

With respect to the intended uses of the named products, brake linings are one component of a vehicle's brake system intended to safely slow or stop vehicles. In general, chrysotile asbestos was utilized in friction parts because it provided suitable friction, strength, binding, stability, heat resistence and other characteristics required to obtain proper performance of a vehicle's braking system. Federal regulations, such as the Federal Motor Vehicle Safety Standards, require a certain level of brake performance.

Chrysler has sold motor vehicles identified as "Chrysler," "Plymouth," "DeSoto" and "Dodge" with asbestos-containing original equipment like automotive transmission and clutch parts. Chrysler service parts, including transmission and clutch parts, have been sold under the trade name Mopar.

Chrysler has never manufactured asbestos-containing clutches. However, Chrysler did obtain these parts from outside suppliers. At least since 1966, the suppliers of asbestos-containing automotive clutch parts for Chrysler motor vehicles were the following: Luk, Fichtel & Sachs, Borg & Beck Division of Borg Warner, Long Co., Lipe-Rollway, and Spicer Division of Dana Corp. Replacement parts Chrysler obtained from these suppliers were sold under the Mopar brand name through authorized dealerships.

Chrysler did not manufacture asbestos-containing automotive transmission and clutch parts, but obtained these parts from outside suppliers. Chrysler does not have information regarding the specific compositions of the asbestos-containing automotive transmission and clutch parts purchased from outside suppliers. Chrysler has not located documentation sufficient to allow it to describe markings on parts obtained from outside suppliers.

At least since 1966, the suppliers of asbestos-containing automotive clutch parts for Chrysler motor vehicles were the following: Bands for automatic transmissions for cars and trucks: Borg-

-14-

Warner, Crawsfordsville, Indiana. Clutch assemblies for passenger cars: Luk (since circa , 1980), Germany. Clutch assemblies for light and medium trucks: Borg & Beck Division of Borg-Warner, Sterling Heights, Michigan, and Elgin, Illinois. Clutch assemblies for medium trucks: Long Co., Wisconsin. Clutch assemblies for heavy duty trucks: Lipe-Rollway, Syracuse, New York, and Spicer Division of Dana Corporation, Auburn, Indiana.; Replacement parts (Clutch Disc Assemblies, Clutch Bands and Clutch Disc Sets) from these suppliers were sold under the Mopar brand names through authorized. dealerships.

Chrysler has sold automobiles with friction materials containing asbestos already installed in the vehicles. Vehicles are generally not shipped in packages. Replacement parts sold by Chrysler that contained friction materials containing asbestos were shipped in cardboard cartons of various sizes. Chrysler does not now have available to it all of the information requested for all packaging it used through the years. However, by way of example, according to a service parts processing and packaging specification, dated August 8, 1995, the size of a cardboard container for brake lining shoe and front wheel disc was 5.25" x 1.5" x 7.75". In addition to warnings set forth below, the packaging would have contained the Chrysler's logo which is a five-pointed star (known as the "Pentastar"). At times, parts were sold under the trade names of Mopar, CycleWeld, and CycleBond.

6.      Does Defendant or any of its subsidiary companies claim that any patent would cover any product listed in answer to Interrogatory No. 5? If so, please state the following:

(a)     The date of each patent;

(b)     The date same was issued;

(c)     The number of each patent application that is pending.

ANSWER: Chrysler understands that plaintiffs allege injury due to exposure to asbestos-containing

-15-

friction products, and therefore, Chrysler's response to this interrogatory is limited to those products. Chrysler is aware of no patents responsive to this interrogatory.

7.    Have any of the products listed above in answer to Interrogatory No. 5 been altered in chemical composition since first being marketed?  If so, please state the following:

    (a)    The trade name of each such product;

    (b)    The date each such product was altered;

    (c)    the nature of the alteration;

    (d)    The reason for the alteration.

ANSWER: Chrysler understands that Plaintiffs alleged exposure to asbestos contained in automotive friction products, and therefore, Chrysler's answer to this interrogatory is limited to those products. The asbestos content of some brakes have changed as scientific knowledge and governmental regulations have developed.  Chrysler stopped manufacturing asbestos containing brake linings in 1988.  At no time did Chrysler manufacture asbestos containing clutch parts.

Chrysler does not have specific information regarding the specific composition of the asbestos-containing friction products purchased from outside suppliers.  Chrysler is aware that its suppliers have removed asbestos from most of its brake linings except for ones in which performance and safety specifications cannot reasonably be met without the use of asbestos.  Presently, Chrysler does not manufacture any vehicles that utilize asbestos-containing friction products.  See also response and objections to Interrogatory No. 5.

8.    Have any of the asbestos-containing products listed in response to Interrogatory No. 5 every been marketed, distributed, packaged, labeled, and/or sold by any other company or business?

If so, please state the following:

(a)    The name and address of each such company.

(b)    The names and addresses of Defendant's distributors in Ohio, Illinois, Michigan, Pennsylvania, Wisconsin, Connecticut, New Hampshire, Maine, Vermont, Rhode Island, New York, New Jersey and Georgia since 1940.

(c)    The date of each sale.

(d)    The name of the person of each location with whom you primarily dealt.

(e)    A list of all asbestos-containing products that you sold to each location from 1945 to 1980.

(f)    The amount of each asbestos product sold to each location during this period.

(g)    Please identify all documents relating to this distributor for the particular location.

ANSWER: Chrysler generally sold new automobiles and replacement parts through authorized dealerships.

Prior to 1981, Chrysler distributed asbestos containing automotive brake and clutch replacement parts under the Mopar, Cycleweld and/or Cyclebond trade names through authorized, independent warehouse distributors. To the extent documents responsive to this interrogatory exist, they will be produced at a mutually agreeable time and place.

8.01.   Has this defendant ever purchased asbestos containing products from any other defendant?

ANSWER: See response and objections to Interrogatory No. 5.

8.02    If the answer to the preceding Interrogatory is yes, please state the following:

-17-

(a)    name each defendant from whom this defendant purchased any asbestos-containing

product;

(b)    list each product purchased from each co-defendant;

(c)    list the date of each purchase of asbestos-containing products from each co-defendant.

ANSWER: See response and objections to Interrogatory No. 5.


8.03    Has this defendant ever sold asbestos containing products to any other defendant?

ANSWER: See response and objections to Interrogatory No. 8.


8.04    If the answer to the preceding Interrogatory is yes, please state the following:

(a)    name each defendant to whom this defendant sold any asbestos-containing

product;

(b)    list each product sold to each co-defendant;

(c)    list the dates of each sale of asbestos-containing products to each co-defendant.

ANSWER: See response and objections to Interrogatory No. 8.


8.05    Has Defendant engaged in the manufacture and/or sale and/or distribution and/or

marketing and/or supply and/or purchase and/or use of non-asbestos-containing products for use in

connection with the temperatures above 125 Fahrenheit since 1930. If so, please state:

(a)    the date such activity began;

(b)    the years during which such activity took place;

(c)    the date when such activity was terminated;

(d)    if such activity was terminated, the reason(s) why;

-18-

(e)     the geographical area into which you claim the product(s) were sold, purchased, or used;

(f)     identify the organizational unit of defendant so engaged;

(g)     the site(s at which each such product was manufactured;

(h)     the material components of each such product, giving specific or approximate percentage both by weight and by volume of each material component of each such product;

(i)     the temperature ranges for which each product(s) was intended to be used;

(j)     the product's generic name;

(k)     the product's trade or brand name;

(l)     the container in which the product was shipped (i.e. paper bags, cardboard boxes) including the size and amount of the container;

(m)    a description of any logos, writing impressions or identifying markings which appeared on the product, as well as a description of the package used, the dates that type of package was used, and any logos, product names, trademarks, etc. which appeared on the package;

(n)     whether the words non-asbestos or asbestos free were used on the package;

(o)     a detailed description of the intended method of preparation and application of the product;

(p)     a description of the physical appearance of the product, including size, shape, color and texture.

ANSWER: Products that do not contain asbestos have different performance characteristics than asbestos containing products and specific products are designed to match those characteristics.

Further, Chrysler is aware that its suppliers of brake linings and other friction products developed products to replace their asbestos-containing products. An asbestos-free product was first available in the market in the late 1970s or early 1980s. Chrysler, with its suppliers, examined alternatives to asbestos lined brakes in the 1980s. This program investigated a wide variety of alternatives to identify those that satisfied the safety and performance requirements of each model vehicle sold by Chrysler. At all times, Chrysler has complied with government safety and performance regulations in developing its brake specifications. Beginning in the mid-1980s, Chrysler did sell automobiles that contained brakes without asbestos brake linings when those linings satisfied the applicable performance requirements. Presently, Chrysler does not manufacture any vehicles that utilize asbestos-containing friction products.

8.06    Did Defendant ever market or distribute any asbestos-containing product manufactured in whole or in part by someone else? If so, please state the following for each such product:

    (a)    the name and address of the manufacturer;

    (b)    the product's trade and brand name;

    (c)    the organizational unit of Defendant who did so;

    (d)    date(s) beginning, ending and during which the marketing or distributing took place;

    (e)    whether the product was distributed through the same channels as those used for the products manufactured by Defendant, and if not, please explain the exact channels of distribution;

    (f)    identify all documents relating the marketing or distribution.

ANSWER: See response and objections to Interrogatory No. 5.

-20-

8.1     Does Defendant have reason to believe that any of the asbestos-containing products listed in response to Interrogatories Nos., 5, 8.02 and 8.04 were used at any of the sites listed on Exhibit A, attached hereto.  If your answer is "yes", please state:

(a)     The basis of your answer.

(b)     Please state which of Defendant's asbestos-containing products listed in Interrogatory No. 5 were used at each job site listed on Exhibit A.

ANSWER: See response to Interrogatory No. 8.

8.2     For each company or business that Defendant knows may have marketed, distributed, installed, and/or sold, those products listed in response to Interrogatory No. 5, please state the following as to each job site listed on Exhibit A:

(a)     The name and address of each such company;

(b)     The date of each sale from Defendant to such other company;

(c)     The name of the person at each other company with whom Defendant primarily dealt.

(d)     Names and quantities of the asbestos-containing products that you marketed, distributed, installed, and/or sold to each such company from 1950 to 1974.

(e)     Please identify all documents relating to sales to each such company.

ANSWER: See response and objections to Interrogatories Nos. 8 and 8.1.

8.3     If you do not know any business that may have marketed, distributed, installed, and/or sold the products listed in response to Interrogatory No. 5 to any of the job sites listed on Exhibit A, please state the name and last known addresses of those companies who Defendant knows marketed, distributed, installed and/or sold their asbestos-containing products in Ohio from 1950 to 1974.  For

-21-

each of those companies, please state the following:

    (a)    Name and address of each such company;

    (b)    The dates of each sale from Defendant to such other company;

    (c)    The name of the person at each other company with whom Defendant primarily dealt;

    (d)    The names of the asbestos-containing products that Defendant marketed, distributed, and/or sold to each such company from 1950 to 1974.

ANSWER: See response and objections to Interrogatory No. 8. It is not possible for Chrysler to identify every different dealership and distributor that has existed in Ohio between 1950 and 1971.

    8.4    Does Defendant have records and/or any knowledge that reflects sales of their asbestos-containing products to any of the sites listed on Exhibit A, attached hereto? If so, please state the following as to each job site listed on Exhibit A:

    (a)    The names and last known addresses of those people with such knowledge.

    (b)    the location of such records.

ANSWER: Historically, Chrysler has maintained documents in various departments in both hard copy and computer record, depending on the department, year and document. Further answering, Chrysler is aware of no documents responsive to this interrogatory.

    9.    Did Defendant, or any of Defendant's distributors, as listed in response to Interrogatory Nos. 8.1, 8.2, and/or 8.3 have sales representatives who specifically called on the sites listed on Exhibit A, attached hereto, from 1945 to 1975? If your response is yes, as to each site listed on Exhibit A, please state the following:

(a)    The name and last known address of each such representative and whether they are still employed by Defendant;

(b)    The period of time they acted as your representative;

(c)    Their general responsibility as to each facility;

(d)    Whether that person is still alive; and

(e)    Any documents relating, referring or pertaining thereto.

ANSWER: See response and objections to Interrogatories Nos. 8 and 8.1.

9.1    Identify all managers and sales personnel responsible for your sales or installation of any asbestos-containing products in Ohio from 1930 to the present and state their position, last known address and the local or regional office through which they were employed.

ANSWER: Chrysler does not have, and has not had, an employee responsible for the sale of its asbestos-containing products in Ohio. Chrysler has employed a number of employees in its sales divisions since 1925, and it would be impossible each employee who was involved in sales of asbestos-containing products in Ohio. Further answering, Paul Kelly, Aftermarket Sales, Advertising and Distribution employee, is knowledgeable regarding the distribution of replacement parts. See response and objections to Interrogatories Nos. 8 and 8.3.

10.    Did Defendant ever have any division or subsidiary engaged in the contract business of applying or removing asbestos-containing products? If so, please state:

(a)    The name of each subdivision;

(b)    The full address of the home office and the date such subdivision or subsidiary was engaged in this contracting business; and

-23-

(c)    Whether said division or subsidiary conducted such business at any of the sites listed

on Exhibit A, from 1940 to 1975? If so, please state the following as to each job site

listed on Exhibit A:

(1)    The dates of such contracts:

(2)    The specific asbestos-containing products that were used or removed in each

contract.

ANSWER: Chrysler understands that Plaintiffs alleged exposure to asbestos contained in automotive

friction products, and therefore, Chrysler's answer to this interrogatory is limited to those products.

Further answering, no.


11.    Did Defendant ever have any division or subsidiary engaged in the contract business

of applying or removing asbestos-containing refractory? If so, please give the name of each

subdivision, the full address of the home office and the date such subdivision or subsidiary was

engaged in this contracting business.

ANSWER: No.


12.    Please identify by location and product produced, each plant in which products listed

in your answer to Interrogatory No. 5 have been manufactured and/or assembled and the dates said

plants have been in operation.

ANSWER: Chrysler manufactured a portion of the brake linings utilized in Chrysler automobiles,

from 1959 to 1988 at Trenton Chemical Plant in Michigan. Asbestos was not used in the

manufacture of brake linings after 1988 at this facility. All other friction materials sold by Chrysler

in its automobiles or as replacement parts were manufactured by the various suppliers previously

-24-

identified.

Over the years, Chrysler assembled its friction products at its Toledo Machining Plant, Detroit Forge and Axle Plant and Kokomo Transmission Plant. Chrysler's Mopar Division would have packaged replacement friction products at its Warren, Michigan, Marysville, Michigan or Centerline, Michigan facilities.

13.    Has Defendant, at any time, entered into a "rebranding" agreement with any other company, either as a buyer or a seller, concerning any asbestos-containing products and/or materials? If so, please state:

      (a)    The name of the company manufacturing the asbestos products under such agreement;

      (b)    The trade name affixed to such products;

      (c)    The periods of time covered by each such agreement;

      (d)    The volume (in dollars amounts) of each such transaction;

      (e)    The purchaser of such products;

      (f)    Does Defendant currently have in its possession any of the writings or contracts concerning such rebranding agreement?

ANSWER: Chrysler objects to the term "rebranding" to the extent that it is vague, ambiguous, and confusing. Chrysler does not know what is meant by the term "rebranding agreements." Subject to this objection, and without waiving same, Chrysler has been unable to locate any documents which are responsive to this interrogatory.

13.1    Have you ever owned or operated a business or portion thereof which engaged in construction, erection or tear out of furnaces, pipes, boilers, turbines, lehrs, ovens, kilns, etc? If so,

please state:

    (a)    the name of said business;

    (b)    the date of commencing business and cessation of business, if applicable;

    (c)    type of construction or tear out performed;

    (d)    state whether said business installed asbestos-containing products on the furnaces, pipes, boilers, turbines, lehrs, etc., i.e., gaskets, pipecovering, block, cement, rope, cloth, clothes, etc., containing asbestos, asbestos pipe, board, etc.

    (e)    state the trade name and/or manufacturer of any asbestos-containing product which you installed or supplied to any site on Exhibit A;

    (f)    provide the dates for the applicable construction, installation or tear-out project.

ANSWER: No.

    13.2    Do you have within your custody, possession, or control any packages that presently or formerly packaged asbestos-containing products or were produced for the purpose of packaging asbestos-containing products contemporaneously with your manufacture sale or distribution of such asbestos-containing products? If so, provide the following:

    (a)    a description of each such package;

    (b)    the present location and custodian of each such package;

    (c)    the date or approximate date on which each such package was produced.

ANSWER: Chrysler has sold automobiles with friction materials containing asbestos already installed in the vehicles. Vehicles are generally not shipped in packages.

    Replacement parts sold by Chrysler that contained friction materials containing asbestos were shipped in cardboard cartons of various sizes. Chrysler does not now have available to it all of the

information requested, or exemplar, for all packaging it used through the years. However, by way

of example, according to a service parts processing and packaging specification, dated August 8,

1995, the size of a cardboard container for brake lining shoe and front wheel disc was 5.25" x 1.5"

x 7.75". In addition to warnings set forth previously, the packaging would have contained the

Chrysler's logo which is a five-pointed star (known as the "Pentastar"). At times, parts were sold

under the trade names of Mopar, CycleWeld, and CycleBond.

## INFORMATION ABOUT DESIGN/TESTING

14.    What is the name, address, and job title of each individual who participated in the

design and preparation of manufacturing specifications for each such product listed above in answer

to Interrogatory No. 5?

ANSWER: Chrysler understands that Plaintiffs alleged exposure to asbestos contained in automotive

friction products, and therefore, Chrysler's answer to this interrogatory is limited to those products.

Chrysler has been manufacturing automobiles and light trucks since 1925, and it would be impossible

to identify each individual involved in the design and preparation of these products.

15.    As to each product listed in response to Interrogatory No. 5, please describe how each

product was to be cut, shaped, scribed, mixed and applied on the job. (In answering this question,

give particular reference as to whether or not the materials were to be sawed or cut on the job, blown

into confined areas, mixed with water in a cement or paste.)

ANSWER: Chrysler understands that Plaintiffs alleged exposure to asbestos contained in automotive

friction products, and therefore, Chrysler's answer to this interrogatory is limited to those products.

Friction products wear out and it is expected that they would be replaced when worn, but not cut,

shaped, scribed, or mixed on the job.

16.    Based upon the material contents of the asbestos-containing products, the method of manufacturing, and the method of application, please state which products in Interrogatories No. 5, 8.02, or 8.04 could be applied by a worker without creating dust.

ANSWER: Chrysler understands that Plaintiffs alleged exposure to asbestos contained in automotive friction products, and therefore, Chrysler's answer to this interrogatory is limited to those products. Generally, brakes and clutches can be applied without releasing asbestos fibers.

17.    Do any documents, including but not limited to, written memoranda, specifications, recommendations, blueprints or other written materials of any kind or character now exist relating to the design and preparation of the products listed in answer to Interrogatory No. 5? If so, please:

    (a)    List each such written material or document;

    (b)    Identify the person or persons presently in possession of each such document;

    (c)    State where each such document is located.

ANSWER: Chrysler understands that Plaintiffs alleged exposure to asbestos contained in automotive friction products, and therefore, Chrysler's answer to this interrogatory is limited to those products. To the extent documents responsive to this interrogatory exist, they will be produced at a mutually agreeable time and place.

18.    Prior to releasing the products listed in Interrogatory No. 5 for sale and usage, were any tests (either animal or human) conducted on said products to determine potential health hazards involved in the use of, or exposure to, the materials and/or products? If so, please state:

    (a)    The name of the products tested and the date of each test;

(b)     The name, address, and job classification of each individual who conducted such tests;

(c)     The results of such tests.

ANSWER: Chrysler objects to this Interrogatory to the extent it is overly broad, vague, ambiguous, unlimited in time or scope, and seeks information outside the scope of permissible discovery under the Ohio Rules of Civil Procedure. Chrysler further objects to the use of the phrase "potential health hazards" as vague, undefined and over broad. Subject to the foregoing objections, formulations are developed for each brake design for each car or truck by either Chrysler's suppliers, or for certain models at certain times, by Chrysler. It is unduly burdensome to provide information as to each and every formulation of the numerous models or vehicles manufactured since the 1920s.

Chrysler understands this interrogatory to pertain to the use and installation of replacement asbestos-containing friction products identified in its answers to Interrogatory No. 5. Except for the brake linings manufactured by Chrysler for the period of time set forth therein, Chrysler purchased the friction products used in its automobiles, including brake linings, from suppliers. Chrysler has no specific information regarding any such tests its suppliers may have performed as they would contain information proprietary to the suppliers.

Chrysler has performed air sampling around brake mechanics during brake repairs. Each study identified that mechanics properly handling friction products are not exposed to asbestos dust in excess of the acceptable limits. Chrysler has determined at the time these responses were prepared that the following air sampling was conducted: The Industrial Hygiene Department of Chrysler Corporation, first sampled air levels in 1972 and then again in 1975. The 1972 sampling was done at Chrysler's brake shoe plant testing garage. Two samples of mechanics working on brake drums were taken. The results were 0.25 fibers per cubic centimeter of air when the mechanic used a brush and 0.0 fibers per cubic centimeter when compressed air was used. In 1975, tests were conducted

-29-

at Dodge Truck. Any asbestos fiber levels were below the limits of detection. Although data from same exists, no formal report was prepared.

In 1971, the Chrysler Industrial Hygiene Department conducted air sampling at the Chelsea Proving Grounds while mechanics worked on brakes. The results were less than .1 fiber per cubic centimeter for an eight-hour time-weighed average. In 1983, that department did air sampling at the Windsor Assembly Plant while two mechanics performed brake replacements on the tractor portion of a tractor-trailer. The results were less than .1 fiber per cubic centimeter. The Chrysler industrial hygiene department also conducted air sampling at the Chelsea Proving Grounds while mechanics performed brake build-up and inspection operations. The results were less than .1 fiber per cubic centimeter. On two different occasions in 1989, the Chrysler Industrial Hygiene Department sampled air levels at the Chelsea Proving Grounds in the vehicle test department. The results of both samples were less than .03 fibers per cubic centimeter.


20.    Were any design changes or modifications made as a result of such tests listed in answer to Interrogatory No. 18 herein above?    If so, please state:

(a)    The trade name of the product changed or modified;

(b)    The nature of the change made and the date of such changes or modifications;

(c)    The name, address, and job classification of each person in charge of making a change.

ANSWER: Asbestos content of some brakes have changed as scientific knowledge and governmental regulations have developed. However, no design changes or modifications were made to brake linings or friction products manufactured by Chrysler as a result of tests described in Response to Interrogatory No. 18. With regard to friction products purchased from suppliers, design changes, if any, would have resulted from decisions made by those suppliers.

-30-

21.    After releasing for sale, distributing or marketing the products listed in answer to Interrogatories No. 5 or 8.02, did Defendant conduct any tests (either on animals or humans) to determine the health hazards involved in the use of said materials and/or products?

    (a)    The names of the products tested and the dates of said tests;

    (b)    The name, address, and job classification of each person, and/or agency conducting said tests;

    (c)    The results of said tests;

    (d)    Whether, as a result of any tests conducted, any products were removed from the market;

    (e)    The names of all products removed from the market as a result of said tests.

ANSWER:  Chrysler periodically performed air sampling tests from 1972 through 1989 as set forth in response to Interrogatory No. 18.  The results of these air sampling tests provide that mechanics were not exposed to excessive levels of asbestos dust or an increased risk of disease from asbestos in the proper handling of Chrysler's friction products.

22.    Has Defendant ever conducted or caused to be conducted any studies concerning the effects of the inhalation of asbestos dust and/or fibers on workers or other persons applying, using and/or working around any of the asbestos products manufactured, sold, distributed and/or relabeled for distribution by you or your predecessor?  If so, please state:

    (a)    The dates and nature of such studies;

    (b)    The names and addresses of persons conducting such studies;

    (c)    The purpose of such studies;

(d)    Identify and list those persons to whom such reports were given and the date of such dissemination;

(e)    State any publication or other written dissemination of the results of such studies;

(f)    State the nature of any action to eliminate or minimize the inhalation of asbestos dust fibers; and

(g)    Attach a copy of reports based upon such studies.

ANSWER: Chrysler understands that Plaintiffs alleged exposure to asbestos contained in automotive friction products, and therefore, Chrysler's answer to this interrogatory is limited to those products. Other than the studies identified in Interrogatory No. 18, no.


INFORMATION ABOUT SAFETY

23.    Before placing in the market the asbestos-containing products that Defendant, mined, manufactured, sold, marketed, installed or distributed on the market, did Defendant make or cause to be made, any studies to determine whether their asbestos-containing products would be hazardous to people? If so, please state:

(a)    The date of said studies;

(b)    What studies were done; and

(c)    The titles of each study.

ANSWER: Asbestos content of some brakes have changed as scientific knowledge and governmental regulations have developed. However, because the tests referenced in Interrogatory No. 8 did not show that mechanics properly handling friction products were exposed to asbestos dust in excess of the acceptable limits, no design changes or modifications were made to brake linings or friction products manufactured by Chrysler. With regard to friction products purchased from suppliers,

-32-

design changes, if any, would have resulted from decisions made by those suppliers.

As the scientific community learned more about the circumstances under which asbestos could be dangerous, federal permissible exposure levels were lowered and feasible alternatives to asbestos-containing brakes, that could pass federal performance requirements, were developed. Chrysler phased out asbestos as an ingredient in brake linings.

24.     Please state whether or not Defendant ever conducted or caused to be conducted any tests in the field (where asbestos-containing products were applied, removed or utilized) to determine the nature and extent of asbestos dust and/or fiber exposure to insulators, applicators, fellow employees, or other workers removing and/or tearing out asbestos-containing products, and/or other workers in the vicinity thereof? If so, please identify:

    (a)     The date, place and nature of each and every test;

    (b)     The particular asbestos-containing products to which each test applied;

    (c)     The results of each test with particular reference to t he number of asbestos fibers per cubic centimeter of air found at each site; and

    (d)     The persons to whom the results said tests were given and the date of such dissemination.

ANSWER: See response and objections to Interrogatory No. 18.

25.     Please state whether or not Defendant ever obtained any knowledge concerning the likelihood of asbestos being hazardous to human health. If so, please state:

    (a)     Whether Defendant first became aware of the hazardous potential of asbestos dust and asbestos fibers;

(b)    The manner in which the Defendant, Defendant's predecessor, or Defendant's subsidiary companies first obtained this knowledge and became aware of said hazards and from what source this information was obtained;

(c)    What information was disseminated within Defendant's company, or its subsidiary or predecessor regarding such adverse consequences or effects;

(d)    Whether any such information is still maintained by Defendant or its subsidiary or predecessor in any written form;

(e)    The name, address and job classification of the custodian of such information.

ANSWER: See response and objections to Interrogatory No. 26.

26.    Please state when Defendant first became aware of the possible association between inhalation of asbestos dust and/or fibers and the contraction of asbestosis and cancers including, but not limited to, gastrointestinal cancer, laryngeal cancer, renal cancer, lymphoma, lung cancer and mesothelioma. As to each disease or condition, please state the source of that information, including a description of all tests conducted relative to the possibility of such a relationship.

ANSWER: Chrysler objects to this Interrogatory as overly broad, unduly burdensome and vague. Chrysler defers to the reasoned judgment and opinions of its medical expert witnesses and the credible medical literature on all such questions of human diseases, their causes, and diagnoses. Subject to the foregoing objections and without waiving same, Chrysler offers the following:

The scientific and medical body of knowledge which relates to the answer to this Interrogatory has undergone continual evolution from the early part of this century until the present day. One common fact which resonates throughout this evolutionary period is that asbestos diseases or conditions of all types are dose-response conditions, meaning the higher the dose of asbestos breathed into the lungs, the greater chance of the development of disease. Another common

-34-

characteristic of asbestos-related conditions or diseases is the long latency between exposure and the manifestation of the condition or disease. It is impossible to explain or understand the occurrence of asbestos-related conditions or diseases in human beings without a thorough understanding of both dose-response and latency. Again, Chrysler defers to the reasoned judgment and opinions of its medical and scientific expert witnesses on all such questions of human diseases, their causes, and diagnoses.

The specifics of exactly how Chrysler personnel acquired such knowledge or awareness is not reasonably ascertainable, but it is probable that it came from reading government publications or other public documents, reports, studies or journals. Chrysler obtained this level of knowledge based upon what was published or reasonably available at that time.

By keeping abreast of the governmental, medical and scientific bodies of knowledge through the years, Chrysler generally became aware that exposures to high levels of asbestos dust in its pure or almost pure forms in manufacturing factories in England, day-in and day-out for a working lifetime, could cause a condition known as asbestosis. The primary study which signaled the general awareness of asbestosis in American workers was the 1938 study by Dr. Dreessen, U.S. Public Health Bulletin No. 241, which reported some asbestosis in asbestos textile factory workers and concluded that if asbestos dust concentrations in the air breathed are kept below 5 million particles per cubic foot, new cases of asbestosis would not appear.

End product users, such as insulators and/or pipe coverers, were not felt to be at risk of asbestos-related conditions as reported by major studies until the early to mid-1960s. From 1946 until approximately the early 1970s, the American Conference of Governmental Industrial Hygienists published the Threshold Limit Value ("TLV") for exposure to asbestos dust at 5 million particles per cubic foot. This level of exposure was adopted by the United States Department of Labor under the

Walsh-Healey Public Contracts Act of 1952. It was not until the mid to later 1970s that there were sufficient studies to illustrate that job site "bystanders" were also at risk for various asbestos-related diseases or conditions.

Chrysler learned that mere exposure to asbestos, without more, does not cause asbestosis. Chrysler has generally learned that inhalation of certain types and quantities of asbestos fibers over certain periods of time is associated with an increased risk of asbestosis for some people. The specifics of exactly how or when Chrysler personnel acquired such knowledge is not certain, but it is believed to have been by the 1940s.

Chrysler disagrees with the premise of this Interrogatory because whether lung cancer can be caused by the inhalation of asbestos is a complicated medical question that depends on such factors as level of exposure, fiber type, smoking history, individual risk factors and more. Cigarette smoking is far and away the leading known cause of lung cancer in the world. Without properly accounting for the role of cigarette smoking in any individual's case, it is impossible to assess the lung cancer risk from other exposures. Such is the case with asbestos. Chrysler believes, through the expertise of its medical and scientific consultants, that the credible governmental, medical and scientific literature to date confirms that lung cancer cannot be attributed to asbestos exposure in the absence of underlying asbestosis. Again, the TLV of 5 million particles per cubic foot of air which was the standard from the 1940s through the 1960s was designed to prevent asbestos disease; therefore, lung cancer was not expected to occur from asbestos exposure if these guidelines were followed. Further, those persons believed to be at risk in the sequence of asbestosis and lung cancer were those in the textile and mining industries, not end product users, until sometime in the mid to late 1960s. Through its expert medical and scientific consultants, Chrysler has become aware of a study by Sir Richard Doll, published in or around 1955 which found an elevated incidence of lung cancer in workers who were

certified by the British government with asbestosis. As this study was disseminated and as it became accepted as authoritative, it became known to stand for the proposition that asbestos exposure contributed to cause lung cancer only in cases where individuals also developed underlying asbestosis. Chrysler likely would have learned of this study at or around the time it was published in the medical literature.

The pleural reactions to asbestos can be divided into pleural plaques, pleural effusion and diffuse pleural thickening. Chrysler believes, through the expertise of its medical and scientific consultants, that pleural plaques do not cause symptoms, such as reduced lung function. The only pleural reaction (excluding mesothelioma), which causes symptoms is, in certain instances, diffuse pleural thickening. It was not until the late 1940s before references in the literature clearly linked asbestos exposure to pleural plaques and pleural thickening. Chrysler would have become aware of the results of these studies at or around the time they were published in the medical literature.

The evidence at the present time suggests to Chrysler that isolated pleural plaques in the absence of asbestosis or diffuse pleural thickening are not associated with clinically detectable restrictive impairment. Pleural reactions as described herein are not believed to be a precursor to any other conditions, such as lung cancer or mesothelioma.

The specifics of how or when Chrysler personnel learned of the link between exposure to certain types of asbestos and mesothelioma is uncertain, but would have probably been at or around the time the Wagner, et al. study was published in the medical literature. The disease mesothelioma was first linked to asbestos exposure in 1960 in a group of case reports published by Dr. J. C. Wagner, et al. This study involved individuals with suspected exposure to a particular fiber-type of asbestos, crocidolite, which was mined and processed in the Northwestern Cape Province of South Africa. The ability of other types of asbestos, such as chrysotile, to cause mesothelioma has been the

subject of much debate, and reported associations between mesothelioma and exposures to amosite asbestos did not come until years after Dr. Wagner's study. There is presently a significant body of medical literature and expert medical opinion which supports the conclusion that chrysotile asbestos does not cause mesothelioma.

Chrysler is aware, through its medical experts and scientific consultants, that some treatment courses have been successful in curing certain individual cases of mesothelioma under the circumstances of those cases. Chrysler is also aware, through its medical experts and scientific consultants, that research is ongoing regarding the efficacy of certain drug, chemical, radiation and surgical treatment courses which may have worked to cure mesothelioma in individual cases and may prove valuable as more than palliative treatments for the disease. Of course, Chrysler defers to the reasoned judgment and opinions of its medical expert witnesses on all such questions of human disease, their causes, diagnosis and treatment.

With regard to the Plaintiffs in this litigation, proper handling of automotive friction materials does not create an increased level of mesothelioma. The air sampling tests performed by Chrysler, as set forth in response to Interrogatory No. 18, showed that proper handling of Chrysler's friction products were not exposed to excessive levels of asbestos dust or an increased risk of disease from asbestos among automotive workers.

27.    Please identify all physicians, industrial hygienists, and other employees (including their names and addresses) who were employed, retained or otherwise engaged by Defendant for research, investigation or study concerning asbestos or asbestos-related diseases.

ANSWER: Chrysler has no documents or summaries that identify all the individuals that worked for Chrysler throughout its history specifically responsive to this request. Based on available information,

Chrysler has been able to identify the following managers and directors of its medical and hygiene areas: Dr. Martin Bruten - deceased (former Medical Director); Dr. Marian Josz - deceased (former Medical Director); Dr. Robert McIntosh - deceased (former Medical Director); Dr. Orlo Robinson (former Medical Director); Dr. Robert Brandt (former Medical Director and Director of Occupational Health & Safety); Dr. Robert Morris (present Lead Physician); J.E. Thomas (present Director of Occupational Health & Safety); Neil McCallum (former Director of Occupational Health & Safety); Gerald Sattelmeir (former Manager of Industrial Hygiene); William Watt (present Manager of Industrial Hygiene).

28.    As to each person who acted in a medical advisory capacity (as it relates in any way to asbestos) to Defendant, please list their name, the date individual acted in this capacity, and that person's current address and job title.

ANSWER: See response and objections to Interrogatory No. 27.

29.    Please state if any medical officer or industrial hygienist or medical consultant ever made at any time any recommendations and/or suggestions to Defendant pertaining to the risks or hazards to persons involved in the manufacture or use of asbestos products and, if so, please state when, by whom or to whom such recommendations and/or suggestions were made and the substance of each recommendation.

ANSWER: Chrysler understands that Plaintiffs alleged exposure to asbestos contained in automotive friction products, and therefore, Chrysler's answer to this interrogatory is limited to those products. Chrysler has had and does have books and other written material that relate to asbestos. Chrysler cannot provide the information requested for every book, report, pamphlet or other document it has

-39-

ever had regarding asbestos. Chrysler has numerous facilities throughout the United States and it is not possible to retrieve and identify every document related to this subject. Chrysler does not have a centralized library or library system that would contain documents responsive to this request. Chrysler was generally aware of and received documents available to the professional community, including its industrial hygiene professionals, regarding asbestos and the potential hazards associated with excessive exposure to asbestos.

30.    Please identify the scientific and/or medical periodicals to which Defendant, its medical department, research department, industrial hygiene divisions, engineering department or consulting physicians subscribed between 1945 and 1975.

ANSWER: Chrysler has had and does have books and other written material that relate to asbestos. Chrysler cannot provide the information requested for every book, report, pamphlet or other document it has ever had regarding asbestos. Chrysler has numerous facilities throughout the United States and it is not possible to retrieve and identify every document related to this subject. Chrysler does not have a centralized library or library system that would contain documents responsive to this request. Chrysler was generally aware of and received documents available to the professional community, including its industrial hygiene professionals, regarding asbestos and the potential hazards associated with excessive exposure to asbestos.

30.1    Please state whether Defendant, its medical officer or industrial hygienist or medical consultant or physicians were ever involved in testing or receiving literature or correspondence from the Mellon Institute.

ANSWER: See response and objections to Interrogatory No. 30.

-40-

30.2    Has any engineer, industrial hygienist or physician in your employ been a member in any professional group, trade group, or any of the following groups:

Asbestos Textile Institute
National Insulation Manufacturers Association
Thermal Insulation Manufacturers Association
Quebec Asbestos Mining Association
Asbestos Information Association
Industrial Health Foundation
Industrial Hygiene Foundation
Iron and Steel Institute
National Safety Counsel
Refractories Institute
Air Hygiene Foundation of America, Inc.
Sprayed Mineral Fiber Association

If the answer is yes, state the following:

(a)    The name of the group or groups in which the individual(s) were members;

(b)    The name and position individual(s) within the Defendant, as defined, who were members;

(c)    The years the individual(s) were members of the groups;

(d)    Whether the Defendant paid the individual(s) dues or membership fees or reimbursed the individual(s) for dues or membership fees in the group.

ANSWER: Chrysler objects to this interrogatory as it is unduly burdensome and oppressive, because the answer to this interrogatory would require a physical review of virtually every writing ever received by any employee of the Chrysler which would be impossible to do. Chrysler or its employees, or both, have throughout the years had memberships in a variety of organizations and at a variety of times. It would be impossible to identify each organization or group. However, the following is a list of some of the organizations or groups responsive to this request: the American Industrial Hygienists Association (AIHS); the Friction Material Standard Institute; the Industrial

-41-

Hygiene Foundation; the Industrial Health Foundation; the American Academy of Industrial Hygienists; the Michigan Industrial Hygiene Society; National Safety Council; the Motor Vehicles Manufacturers Association; the Battery Council International; the Society of Automotive Engineers; and the Engineering Society of Detroit; the Adhesive and Sealant Council; American Society for Testing Materials; American College of Toxicology, Michigan section of the Society of Toxicology Board of Certified Safety Professionals; and the American Chemical Society.  Generally, Chrysler or its employees may have received documents disseminated from these groups and organizations.

31.    State in detail what test, if any, Defendant ever made with regard to the quantity, quality, or threshold limit values of asbestos dust, fibers or particles to which workers were exposed while using, working with and/or around, installing and/or applying your asbestos containing products.

ANSWER: See response and objections to Interrogatory No. 18.

32.    For each test described in Interrogatory No. 31, please give the name of the person conducting the test, the date of the test, and attach true copies of any documents, including but not limited to, reports, findings or memoranda concerning such tests or studies.

ANSWER: See response and objections to Interrogatory No 18.

33.    Please state the year that Defendant was first advised of either threshold limit values or maximum allowable concentrations of both asbestos dust and total dust by the American Conference of Governmental Industrial Hygienists and state the name of the employee/official of the company receiving such advice.

ANSWER: Chrysler understands that the American Conference of Governmental and Industrial Hygienists (ACGIH) defines threshold limit value-time weighted average (TLV-TWA) as the eight hour time weighted average concentration of a substance to which nearly all workers may be repeatedly exposed (day after day) without adverse effect. Chrysler was aware of published threshold limit values, or their equivalent, which would have been published at various times by the ACGIH or by OSHA. Members of the industrial hygiene, safety or medical department, such as Gerry Sattelmeier, were likely to have been aware of the TLVs.

33.1    State whether this defendant at any time caused to be conducted on any job site, any air sampling, dust counts, tests or other activities to determine air quality or worker safety. If your answer is in the affirmative, please indicate:

(a)    the date of any such air samples, tests, or activities;

(b)    by whom such activities were performed;

(c)    where such activities were performed;

(d)    the results of any such activities.

ANSWER: See response and objections to Interrogatory No. 18.

34.    Does Defendant maintain a library dealing with industrial hygiene, medicine, safety and engineering and/or research? If so, state:

(a)    The date each such library was established;

(b)    The location of each library;

(c)    the name(s) of the librarian(s) since 1930;

(d)    List all journals subscribed to by you concerning asbestos, industrial hygiene,

-43-

medicine, safety, and/or engineering;

(e)    List all books and articles dealing with asbestos and asbestos-related disease and the date acquired.

ANSWER: Chrysler has had and does have books and other written material that relate to asbestos. Chrysler cannot provide the information requested for every book, report, pamphlet or other document it has ever had regarding asbestos. Chrysler has numerous facilities throughout the United States and it is not possible to retrieve and identify every document related to this subject. Chrysler does not have a centralized library or library system that would contain documents responsive to this request. Chrysler was generally aware of and received documents available to the professional community, including its industrial hygiene professionals, regarding asbestos and the potential hazards associated with excessive exposure to asbestos.

35.    Did Defendant in the 1920's or 1930's commission, or participate in the arrangements with Metropolitan Life Insurance Company for studies at the Trudeau foundation at Saranac Lake, New York, concerning the effect of inhalation or ingestion of asbestos fibers upon human and/or animal bodies.

ANSWER: Chrysler has had and does have books and other written material that relate to asbestos. Chrysler cannot provide the information requested for every book, report, pamphlet or other document it has ever had regarding asbestos. Chrysler has numerous facilities throughout the United States and it is not possible to retrieve and identify every document related to this subject. Chrysler does not have a centralized library or library system that would contain documents responsive to this request. Chrysler was generally aware of and received documents available to the professional community, including its industrial hygiene professionals, regarding asbestos and the potential hazards

-44-

associated with excessive exposure to asbestos. Further answering, Chrysler is aware of no documents responsive to this interrogatory.

36.    When was Defendant first aware of reports of studies of the Trudeau foundation of Saranac Lake, New York, entitled Effects of the Inhalation of Asbestos Dust in the Lungs of Asbestos Workers by A.J. Lanza, Assistant Medical Director published in the J. Public Health Report, Vol. 50, No. 1, dates January 4, 1935 (Lanza Report)?

ANSWER: Chrysler has had and does have books and other written material that relate to asbestos. Chrysler cannot provide the information requested for every book, report, pamphlet or other document it has ever had regarding asbestos. Chrysler has numerous facilities throughout the United States and it is not possible to retrieve and identify every document related to this subject. Chrysler does not have a centralized library or library system that would contain documents responsive to this request. Chrysler was generally aware of and received documents available to the professional community, including its industrial hygiene professionals, regarding asbestos and the potential hazards associated with excessive exposure to asbestos. Further answering, Chrysler is aware of no documents responsive to this interrogatory.

36.1    Did you ever contract with Saranac Laboratories to study the hazards of any dust producing product manufactured by you (whether asbestos containing or not)? If so, identify by date and author all documents concerning or any way related to such study.

ANSWER: Chrysler is aware of no documents responsive to this interrogatory.

36.2    Did you ever contract with Saranac Laboratories to analyze dust or products? If so,

identify by date and author all documents concerning or any way related to such analysis.

ANSWER: Chrysler is aware of no documents responsive to this interrogatory.

37.    Please state whether the Defendant at any time has been a member of any "trade organization" or "trade association" composed by other manufacturers, miners, distributors, and/or sellers of asbestos-containing products and, if so, please identify the name and address of each such association and organization, the dates of membership, and the names of any publications issued or written by such association or organization.

ANSWER: See response and objections to Interrogatory No. 30.2.

38.    With respect to each trade organization or association listed in answer to Interrogatory No. 37, please state whether the minutes of the group's meetings and any correspondence between the members of such groups concerning the hazards of asbestos exposure are available.

ANSWER: See response and objections to Interrogatory No. 30.2.

39.    Please identify by name the technical and trade association periodicals to which the Defendant subscribed, and state whether Defendant had knowledge of any articles being printed, or withheld from printing, in said periodicals pertaining to the potential hazards of asbestos. If so, please state the following:

(a)    The title of each such article;

(b)    The periodical in which each such article was published;

(c)    The date each such article was published;

(d)   A detailed explanation of the reason for withholding any such article for printing;

(e)   Produce documentation with refers, alludes or mentions articles which were withheld for publication.

ANSWER: See response and objections to Interrogatory No. 30.

40.   Please state whether, prior to 1975, the Defendant sponsored, or attended any meeting, seminar, conference, convention or legislative hearing where the subject of occupational health and exposure to asbestos was discussed and, if so, please state the date and place of such meeting and the name and address of any speakers or participants.

ANSWER: Chrysler, its employees, or both, have attended a number of meetings, seminars, conferences and conventions over the years. It would be impossible for Chrysler to identify every meeting, seminar, conference or convention that has been attended as Chrysler does not have a centralized library that would contain this information. Further answering, Chrysler is aware of no documents responsive to this interrogatory.

## WARNINGS/SALES PROMOTION

41.   As to each product listed in response to Interrogatories Nos. 5 and 8.02, please state whether Defendant, at any time, published and/or distributed any printed materials, including but not limited to brochures, pamphlets, catalogs, packaging or other written materials of any kind or character that contain any warnings, cautions, caveats or directions concerning the possible health effects of the products on a person. If so, please state as to each product:

(a)   The name of each relevant product;

(b)   The wording of each such warning;

(c)   A description of each such printed material;

-47-

(d)     The method used to distribute the warning to persons who are likely to use the products;

(e)     The date each such warning was issued;

(f)     Whether any warning accompanied any of your asbestos-containing products' sale literature, handout or pamphlets;

(g)     Please attach a copy of the warning and date said warning was issued;

(h)     The name, address, and job classification of each person who presently has possession of the above-described documents;

(i)     The name or names and addresses of the company who provided, produced, or manufactured the boxes or containers on which the warning appeared and dates these boxes with the warning appeared.

ANSWER: Chrysler states that automotive brake and clutch parts have been accompanied by cautionary language. The first Chrysler service manual containing such language concerning brake parts was printed in 1973, as follows:

> CAUTION: When resurfacing or refacing brake shoes follow manufacturer recommendations for proper use of their equipment. Whatever equipment is used, ensure that proper ventilation is provided to remove asbestos dust, which can be detrimental to health.

The following language first appeared in Chrysler's 1984 service manuals regarding brake service:

> CAUTION: When servicing brake assemblies or components, do not create dust by sanding, grinding or by cleaning brake parts with a dry brush or with compressed air. A water-dampened cloth should be used. Many brake components contain asbestos fibers which can become airborne if dust is created during service operations. Breathing dust which contains asbestos fibers can cause serious bodily harm.

The following language appeared in Chrysler's 1984 service manual regarding clutch assemblies:

> CAUTION: When servicing clutch assemblies or components do NOT create dust by sanding or by cleaning clutch parts with a dry brush or with compressed air. (A water-dampened cloth should be used.) The dust is created during service operations. Breathing dust-containing asbestos Fibers

-48-

may cause serious bodily harm.

Such language has generally appeared in service manuals since 1984.

Based upon the best information available, from 1973 to the present, the cartons for Chrysler's asbestos containing replacement parts sold through its Mopar Division contained one of the following:

### DANGER

CONTAINS ASBESTOS FIBERS
AVOID CREATING DUST
CANCER AND LUNG DISEASE HAZARD

### CAUTION

THIS PRODUCT CONTAINS ASBESTOS.
AVOID CREATING DUST.
BREATHING ASBESTOS MAY RESULT IN SERIOUS BODILY HARM.

### CAUTION

AVOID CREATING OR
BREATHING DUST.

CONTAINS HAZARDOUS
SUBSTANCES WHICH
MAY CAUSE LUNG INJURY

Caution: Contains asbestos fibers. Avoid
creating dust. Breathing asbestos dust may
cause serious bodily harm.

When servicing this brake lining or any component related to it or located near it, prevent asbestos dust from becoming airborne by vacuuming the assembly with an industrial type vacuum cleaner equipped with a high efficiency filter system and by washing the assembly with an appropriate brake parts washer if necessary. Never remove dust or dirt from this assembly by blowing with compressed air.

-49-

42. Has sales material been prepared by Defendant or its agents for purposes of marketing or advertising the asbestos products listed in answer to Interrogatories Nos. 5 and 8.02? If so, please state:

    1    The name and address of each person or entity who prepared same;

    2    The name, address and job title of each person who presently has possession of same;

    3    The date same was prepared;

    4    The media used to disseminate the sales material.

ANSWER: For the period from 1930 through 1985, Chrysler created sales materials for the replacement parts referenced previously. Chrysler is in possession of some printed materials promoting Chrysler's Cyclebond brake linings, from the 1950s, and Mopar performance parts from the 1980s and 1990s.

43. Has any written material of any kind or character been prepared by Defendant, Defendant's predecessor or any of Defendant's subsidiary companies or their agents indicating how the products listed in answer to Interrogatories Nos. 5 and 8.02 should be used or maintained by the ultimate user or those working in facilities or at job sites where the product was used, installed or removed, including, but not limited to, those sites listed on the job site list attached as Exhibit A. If so, please state the following:

    (a)    The name, address, and job classification of each person who prepared same;

    (b)    The name, address and job classification of each person who presently has possession of same;

    (c)    The dates and manner in which said material was distributed to purchasers of the products in answer to Interrogatory No. 5.

-50-

ANSWER: See response and objections to Interrogatory No. 41.

44.    Was any written material of any kind prepared by Defendant and distributed to those individuals listed in response to Interrogatory No. 9? If so, please state the following:

(a)    Identify the written material by content and date:

(b)    To whom it was delivered.

ANSWER: See response and objections to Interrogatories Nos. 9 and 41.

45.    Does Defendant contend that asbestos-containing products can be manufactured so as to eliminate all potential health hazards to persons working with or around, installing or applying same? If so, please state the following:

(a)    The date that Defendant first determined that another product could be used in place of asbestos;

(b)    The chemical of the substitute:

(c)    Whether the substitute is suitable for the purpose for which they are to be used;

(d)    Whether Defendant used the substitute for asbestos to 1971;

(e)    Whether Defendant ever used the substitute for asbestos for high or low heat insulation.

ANSWER: It is impossible to answer a question as to all the potential health hazards concerning "asbestos-containing products" with no time reference. As to brakes in cars, the air sampling tests Chrysler conducted (*see* Response to Interrogatory No. 18) showed that mechanics who properly handled automotive friction products were not exposed to excessive asbestos fibers or an increased risk of asbestos related disease. During the braking process, extreme temperatures, abrasion and shearing forces substantially change the hard phenolic resin brake linings, destroying or changing the

-51-

form of the ingredients, including asbestos. The asbestos in an automobile friction product is transferred into an inert, non-pathogenic mineral, forsterite.

Chrysler does not have specific information regarding the specific composition of the asbestos-containing friction products purchased from outside suppliers. Chrysler is aware that its suppliers have removed asbestos from most of its brake linings except for ones in which performance and safety specifications cannot reasonably be met without the use of asbestos. Presently, Chrysler does not manufacture any vehicles that utilize asbestos-containing friction products. See also response and objections to Interrogatory No. 5.

46.    Did Defendant give warnings to any individuals at the sites listed on Exhibit A, including any individuals who owned, operated, or managed the facilities at the sites listed on Exhibit A, regarding the potential health hazards of any product listed in response to Interrogatories Nos. 5, and 8.02. If yes, please state:

    (a)    Name of person most knowledgeable about this communication.

    (b)    Name of person at the sites listed on Exhibit 1, attached hereto mot knowledgeable about this communication.

    (c)    Dates of each communication.
    (d)    contents of each communication.

ANSWER: See response and objections to Interrogatory No. 41.

## KNOWLEDGE OF PREVIOUS INJURIES

47.    Did any person prior to 1970, file a claim against any Workers' Compensation carrier covering Defendant alleging that he or she contracted a disease as a result of exposure to asbestos? If so, please state the following:

(a)  A list of each such claim by claimant's name, date filed, the caption and jurisdiction involved;

(b)  The disease alleged in each such claim;

(c)  A brief summary of the disposition of each such claim; and

(d)  The name, address and job classification of the person of persons having custody of the records pertaining to each such claim.

ANSWER: The information sought in this interrogatory is irrelevant and immaterial for the reasons that whether or not workers' compensation claims have been filed has no relevance to the end user of Chrysler's product. Chrysler does not organize workers' compensation claims by injuries claimed. Therefore, it would be extremely burdensome, onerous and harassing to compel Chrysler to review every single workers' compensation claim ever filed. Workers' compensation records are available at various facilities maintained by Chrysler.

47.1  Please identify all documents concerning or in any way related to any decisions made by you to cease manufacturing asbestos-containing products.

ANSWER: Chrysler understands that plaintiffs allege injury due to exposure to asbestos-containing friction products, and therefore, Chrysler's response to this interrogatory is limited to those products. Chrysler is aware of no documents responsive to this interrogatory.

47.2  Has any person or company from which you purchased asbestos containing products ever issued a recall of their products or taken any action to those products off the market after said products were in your possession? If so, provide:

(a)  the date of said recall;

(b)  the name of the company which issued the recall;

(c)    a copy of the recall.

ANSWER: Chrysler has not recalled any of its products from the market as a result of asbestos-related health concerns.

47.3    State what action, if any, you have ever taken since 1930 to minimize or eliminate any risk of occupational disease or pneumoconiosis to those at any time engaged in the manufacture or production of asbestos-containing products.

ANSWER: Object

47.4    State what action, if any, you have ever taken since 1930 to minimize or eliminate any risk of occupational disease or pneumoconiosis to those at any time engaged in the use, as distinguished from the manufacture, or exposed to the use of asbestos-containing or industrial insulation products or who were otherwise exposed to asbestos-containing or industrial insulation products.

(a)    describe such action;

(b)    state when such action was taken;

(c)    state what written material exists related to such action;

(d)    state the names, job titles and last known address of the individuals who undertook such actions.

ANSWER: See response to Interrogatory No. 45.

48.    Did Defendant receive notice prior to 1968 that any person was claiming injury as a result of using asbestos products manufactured, sold, installed, and/or distributed by Defendant? If

-54-

so, please state:

    (a)    The name and address of each claimant;

    (b)    the date of notice of each claim;

    (c)    A description of the claim;

    (d)    The type of injuries allegedly sustained;

    (e)    The name and address of each attorney representing the individuals making such claims;

    (f)    The style and court number of each such claim;

    (g)    The resolution of each claim.

ANSWER: The information sought in this interrogatory is irrelevant and immaterial for the reasons that whether or not claims have been filed has no relevance to the end user of Chrysler's product. This interrogatory is further objectionable as being burdensome, and is sought merely for purposes of harassment. Chrysler does not organize claims by injuries claimed. Therefore, it would be extremely burdensome, onerous and harassing to compel Chrysler to review every single claim ever filed.

43.1 Describe the method by which you have maintained records concerning the manufacture, sale, supply, distribution, use, advertising, delivery and/or installation of each of asbestos-containing products. For each description provide the following:

    (a)    each present and former company or corporate department, division or subdivision responsible for maintaining such records;

    (b)    the manner in which the records are kept (e.g. boxes, computer tape, microfilm, etc.);

    (c)    the inclusive dates of any such manufacturer, sale, supply, distribution, use,

advertising, delivery, and/or installation or tear-out which such record keeping system covers;

(d)     the present location at which all such records are maintained;

(e)     the identify of each person employed by you at any time from 1930 to the present who is or was responsible for the collection and maintenance of such records.

ANSWER: Historically, Chrysler has maintained documents in various departments in both hard copy and computer record, depending on the department, year and document.

48.2     State whether any records concerning the manufacture, sale, supply, distribution, advertising, delivery, use or installation or tear-out of asbestos-containing products have been destroyed or discarded and if so, indicate:

(a)     the date and location of such destruction or discard;

(b)     the custodian and location of such records prior to their destruction or discard and the identity of each employee, representative, official or agent who ordered, authorized or supervised such destruction or discard.

ANSWER: Chrysler has been manufacturing automobiles and light trucks since 1925, and it would have disposed of some records over the years.

48.3     For all documents, other than invoices, work orders and/or purchase orders, which relate to matters relevant to all of the preceding interrogatories:

(a)     Is there any kind of index for the documents?

(b)     How many pages is the index of documents/

(c)     How many documents are referred to in the index?

(d)     Is the index maintained in electronic format (i.e. database, word processing or other

-56-

computerized format)?

    (e)    What manner of electronic format is used?

ANSWER: Chrysler understands that Plaintiffs alleged exposure to asbestos contained in automotive friction products, and therefore, Chrysler's answer to this interrogatory is limited to those products. Subject to said objections and without waiving same:

    (a)    No.

    (b)    No.

    (c)    No.

    (d)    No.

    (e)    Not applicable.


48.4 For all invoices, work orders and/or purchase orders, which relate to matters relevant to all the preceding interrogatories:

    (a)    Is there any kind of index for the documents?

    (b)    How many pages is the index of documents?

    (c)    How many documents are referred to in the index?

    (d)    Is the index maintained in electronic format (i.e. database, word processing or other computerized format)?

    (e)    What manner of electronic format is used?

ANSWER: Chrysler understands that Plaintiffs alleged exposure to asbestos contained in automotive friction products, and therefore, Chrysler's answer to this interrogatory is limited to those products. Subject to said objections and without waiving same:

    (a)    No.

    (b)    Not applicable.

(c)    Not applicable.

(d)    Not applicable.

(e)    Not applicable.

PLAINTIFF/DECEDENT

49.    Has Defendant obtained statement from any witness including the Plaintiffs?  If so,
please

(a)    list each witness who has given a statement and the name, address, and job title of
each person having custody of any such statement.

ANSWER:  Chrysler objects to this Interrogatory as invasive of the attorney work product privilege.

Without waiver, Chrysler has not obtained statements from Plaintiffs.


50.    Do you contend that the Plaintiff/Decedent improperly used those products listed in
response to Interrogatory No. 5?  If so, please set out in detail in what respect the product was
improperly used.

ANSWER: Chrysler is unable to respond to this Interrogatory until discovery is completed.  Chrysler
cannot respond regarding use or misuse of any product not manufactured or sold by Chrysler.


51.    As to the sites listed on Exhibit A, and as to each Plaintiff/Decedent, please state
whether Defendant contends that there was any substance other than asbestos which contributed or
caused Plaintiff/Decedent's injuries.  If your answer is yes, please state the following:

(a)    The facts upon which you rely;

(b)    The identity of the sources upon which you rely which substantiate these facts.

ANSWER: Chrysler is unable to respond to this Interrogatory until discovery us completed.


-58-

RESPIRATORS

52.  Would any respirator, mask or other breathing devices prevent inhalation of the asbestos dust and fibers contained in products listed in answer to Interrogatories Nos. 5 and 8.02?  If so, state:

(a)  When the respirator was sold;

(b)  A detailed description of such respirator or other breathing devices, including name of manufacturer and model number;

(c)  The basis of your claim that such respirators or other breathing devices will prevent the inhalation of such dust and fibers;

(d)  Identify any tests performed regarding the efficaciousness of such respirators and other breathing devices in preventing the inhalation of asbestos dust and fibers including date, title, author and number;

(e)  List all documents which mention, allude or refer to tests performed on breathing devices which prevented the inhalation of asbestos dust and/or fibers.

ANSWER: Chrysler understands that Plaintiffs alleged exposure to asbestos contained in automotive friction products, and therefore, Chrysler's answer to this interrogatory is limited to those products. Chrysler is aware of no documents responsive to this interrogatory.


53.    Does Defendant expect to call expert witnesses at the trial of this case?  If so, please state the following:

(a)  Their identity, last known address;

(b)  The subject matter on which the expert is expected to testify;

(c)  The expert's specific conclusion and specific opinions and the specific basis therefore;

(d)  The expert's qualifications to render the opinions set forth above;

(e)  Whether any person identified in sub-paragraph (a) above has provided a report or other documentation to you, and if o, identify such document or report;

(f)  Identify all documents that you have provided to each person identified in response to sub-paragraph (a) above; and

(g)    Described in detail the education and work history of, and identify any books, treaties, article, published and unpublished reports, studies or other scholarly works authored by any individual identified in response to subparagraph (a) above. Alternatively, in lieu, of said response, attach a copy of a resume or curriculum vitae and a list of publications to your answer.

ANSWER: Chrysler objects to Interrogatory No. 53 to the extent it is overly broad, vague and seeks information outside the scope of permissible discovery. Each case involves specific facts and allegations. Therefore, a case-specific designation may be made by Chrysler. Subject to said objections and without waiving same, the following persons may give expert testimony at the time of trial:

> George Traylor
> 5034 County Road 15
> Wadley, Alabama 36276
> 256/395-4837
> Contact through undersigned counsel only.

George Traylor may testify about general practices relating to brake servicing and repair.

> James Knoll
> DaimlerChrysler Corporation
> 1000 Chrysler Drive
> Auburn Hills, MI 48326
> Contact through undersigned counsel.

James Knoll, a former brake engineer for DaimlerChrysler, may testify about brake design, brake specifications, and brake manufacturing, including, but not limited to, the composition and asbestos content of brake linings, and the availability or lack of substitutes for asbestos in friction materials.

Donald Kvamberg
DaimlerChrysler Corporation
1000 Chrysler Drive
Auburn Hills, Michigan 48326
Contact through undersigned counsel.

Donald Kvamberg, a brake engineer for DaimlerChrysler, may testify about brake design, brake specifications, and brake manufacturing, including, but not limited to, the composition and asbestos content of brake linings, and the availability or lack of substitutes for asbestos in friction materials.

Gerald Sattlemeier
c/o DaimlerChrysler Corporation
Auburn Hills, Michigan
Contact through undersigned counsel.

Gerald Sattlemeier is expected to testify regarding DaimlerChrysler Corporation's industrial hygiene practices from 1968 through 1991.

John F. Craighead, M.D.
1845 Four Winds Road
Ferrisburgh, Vermont  05456
802/425-3480

Edward Gaensler, M.D.
Boston University Medical Center
80 East Concord Street
Boston, Massachusetts  02118
617/638-4077

Gerald Kerby, M.D.
University of Kansas Medical Center
3901 Rainbow
Kansas City, Kansas  66160-7381
913/588-5000

Dorsett Smith, M.D.
4301 Colby, Suite 201
Everett Washington  92203
206/259-5171

Philip T. Cagle, M.D.
Pathology Department, Room 220-B
Baylor College of Medicine
One Baylor Plaza

-61-

Houston, Texas 77030-3411
713/798-3671

Graham W. Gibbs, Ph.D.
14-4122 Range Road
265 Spruce Grove
Alberta, Canada T7Y1E7
403/987-2883

John Bass, M.D.
2451 Fillingham Street
Tenth Floor, Suite H
Mobile, Alabama 36617
334/471-7888

Robert M. Ross, M.D.
17030 Nanes, Suite 210
Houston, Texas 77090
281/440-8851

John R. Holcomb, M.D.
4410 Medical Drive, Suite 440
San Antonio, Texas 78229-3755
210/692-9400

Hans Weill, M.D.
Tulane University
School of Medicine
1700 Perdido Street, Second Floor
New Orleans, Louisiana 70112
504/588-5265

Victor L. Roggli, M.D.
Duke University Medical Center
Department of Pathology
Box 3712
Durham, North Carolina 27710
919/286-0411

Drs. Craighead, Gaensler, Reichman, Kerby, Smith, Cagle, Bass, Ross, Holcomb, Weill and Roggli, if called to testify, are expected to provide testimony concerning the anatomy and function of the respiratory and circulatory systems; examinations conducted and opinions regarding tissue samples of decedents; the symptomatology, disease process and diagnosis of asbestosis and cancer of the respiratory system, peritoneum and peritoneal cavity; the nature and extent of medical and scientific knowledge regarding any association of pulmonary disease with asbestos fiber and the effect of exposure to substances other than asbestos in the development and manifestation of diseases of the respiratory system; the methods of diagnosis and means of establishing the differential diagnosis of asbestos-related diseases with non-asbestos related diseases; the incidence of lung cancer in the general population and those individuals exposed to asbestos; cigarette smoking and its effects on the lungs; the difference between impairment and disability; the effect of asbestosis on disability and life expectancy; the lack of relationship between pleural plaques and development of any cancer; the history, evolution and knowledge of asbestos-related diseases; and the evolution of the medical communities awareness of the increased risks for an asbestos-related disease in the cases of prolonged exposure.

Drs. Craighead and Roggli, if called to testify, may testify regarding their review of Plaintiff's and/or Decedent's medical records and diagnosis of the physical condition and relationship, if any, between Plaintiff and/or Decedent's exposure to asbestos as well as asbestos exposure through brake or clutch servicing. Drs. Craighead and Roggli may testify in the area of the medical and scientific aspects of exposure to dust as produced by brake or clutch products and the development of asbestos-related disease generally.

Dr. Gibbs may testify in the areas of toxicology, industrial hygiene, inhalation toxicology and methodology, mechanisms of pulmonary irritant activity and the extrapolation of data from animals to man.

Francis W. Weir, Ph.D.
17350 Tomall Parkway
Suite 330, Willowbrook Place III
Houston, Texas 77064
713/893-4003

Defendant expects to call Francis W. Weir, Ph.D. as an expert witness at the trial of this matter. Dr. Weir's Curriculum Vitae has been previously provided to counsel.

The subjects of Dr. Weir's expected testimony include the fields of pharmacology, toxicology and industrial hygiene, generally, and particularly as they relate to asbestos fiber exposure in various work places. He is expected to testify concerning the types and characteristics of asbestos, as well as the recognized pathogenic potential from exposure to fibers of these substances. If asked, his testimony will include a discussion of the way asbestos containing materials were used generally within industry. He will also be prepared to discuss laws and regulations and relevant standards relating to asbestos exposure, the characteristics and epidemiology of asbestos-related or associated diseases and relevant medical and scientific literature on these subjects. Additionally, he is expected to discuss the evolution of the role of industrial hygiene professionals in the management of industrial health concerns within the U.S. industry. Dr. Weir may also discuss and describe the effects of

-63-

chemicals, especially those contained in cigarettes, on human physiology.

It is expected that Dr. Weir will offer the opinion that, based on the description of work activities of concern in this matter, and assuming those descriptions are correct, there is no scientific basis or affirmative evidence to conclude that plaintiffs' exposures ever regularly exceeded the concurrently acceptable time weighted average values for this material.

Dr. Weir may also testify regarding the knowledge of the toxicology and appreciation for the hazards relating to the use of asbestos containing materials at various intervals throughout the twentieth century.

Dr. Weir's opinions will be based upon his education, experience and professional training, his review of relevant medical, epidemiological, scientific and technical literature, and, his review and analysis of the case specific materials provided to him concerning this matter.

Dr. Weir may also be asked to respond to the testimony of certain witnesses offered at the time of trial including, but not limited to, testimony offered by plaintiffs regarding tests of defendants' products. He, therefore, reserves the right to supplement, amend or otherwise modify the opinions to be offered accordingly. He will continue to review material, which may come to his attention regarding this matter and may utilize this material to develop additional opinions and conclusions or modify his opinions and conclusions, if warranted.

Dr. Weir may testify regarding the ability of friction products, including brakes, to release respirable asbestos during their intended uses. He may testify regarding the general scientific literature, or lack of if, regarding fiber release from friction products or adverse health effects associated with them. He may testify about tests he has done on, grinding, changing and otherwise manipulating friction products and that such activities do not release harmful levels of respirable asbestos fibers.

Dr. Mark Robert Wick
301 Peacock Drive
Charlottesville, VA 22903-9716
(804) 245-9613
(804) 245-9643

Dr. Wick is a pathologist. He may testify, live or by deposition, concerning his review of the medical records, pathology and/or work history of Plaintiff and Plaintiff's medical condition, and the cause of Plaintiff's medical condition. His testimony may also include discussion of asbestos and its effect on human health generally and Plaintiff's condition specifically, and the effect that other substances have on human health generally and Plaintiff's condition specifically. Dr. Wick may also testify regarding the medical conditions of Plaintiff based on review of medical records, x-rays, Plaintiff's experts' reports and supplemental reports and his training, experience and other special expertise. Further, Dr. Wick may testify concerning the increased risk, if any, of cancer faced by asbestos exposed workers and the prognosis of such individuals.

-64-

In addition, if called to testify, either live or by deposition, Dr. Wick is expected to provide testimony regarding the areas stated below:

(1)     the anatomy and function of the respiratory and circulatory systems, including the protective systems of the body with regards to the inhalation and retention of dust, and the diagnosis and treatment of disease affecting such systems;

(2)     the nature of asbestos and asbestos-related diseases;

(3)     the symptomatology, disease process and diagnosis of asbestosis and cancer associated with the respiratory system, peritoneum and peritoneal cavity;

(4)     the nature and extent of medical and scientific knowledge regarding any association of obstructive pulmonary disease with asbestos fiber exposure;

(5)     the effect of exposure to substances other than asbestos on the development and manifestation of obstructive and restrictive conditions and diseases of the respiratory system and other causes of obstructive and restrictive disease or defects of the respiratory system;

(6)     methods of diagnosis of various diseases, especially the means of establishing the differential diagnosis of alleged asbestos-related diseases with other non-asbestos-related diseases;

(7)     incidence of lung cancer among individuals with asbestosis or asbestos exposure as compared to non-asbestotic asbestos workers, non-asbestos exposed workers and to the general population;

(8)     cigarette smoking and its effects on the lungs and other organs;

(9)     the relationship of cigarette smoking to cancer of the lung and cancers of other body parts with reference to epidemiology studies and physiologic effect;

(10)    the difference between impairment and disability;

(11)    the effect of asbestosis or other asbestos-related disease, or asbestos exposure without asbestosis or other asbestos-related disease, on disability and life expectancy;

(12)    the lack of relationship between the presence of pleural plaques and a later development of any form of cancer;

(13)    the history of evolution and knowledge of asbestos related diseases;

(14)    the import of any exhibit introduced as evidence, or any items prepared for use or used for demonstrative purposed by any witness;

(15)    cancer incidence in the general population and among asbestos workers and its potential causes;

(16)    the incidence of mesothelioma among various kinds of workers exposed to asbestos, and the relative importance of various fiber types and the cause of mesothelioma; and

(17)    to the extent not covered above, asbestos medicine in general.

Dr. John Ritter
Division of Surgical Pathology
Suite 300, Peters Building
Washington University Medical Center
One Banes Hospital Plaza
St. Louis, Missouri  63110
(314) 362-0101

Dr. Ritter is a pathologist. He may testify, live or by deposition, concerning his review of the medical records, pathology and/or work history of Plaintiffs and Plaintiffs' medical condition, and the cause of Plaintiffs' medical condition. His testimony may also include discussion of asbestos and its effect on human health generally and Plaintiffs' specifically, and the effect that other substances have on human health generally and Plaintiffs' condition specifically. Dr. Ritter may also testify regarding the medical conditions of each Plaintiff based on review of medical records, x-rays, Plaintiffs' experts' reports and supplemental reports and his training, experience and other special expertise. Further, Dr. Ritter may testify concerning the increased risk, if any, of cancer faced by asbestos exposed workers and the prognosis of such individuals.

In addition, if called to testify, either live or by deposition, Dr. Ritter is expected to provide testimony regarding the areas stated below:

(1)    the anatomy and function of the respiratory and circulatory systems, including the protective systems of the body with regards to the inhalation and retention of dust, and the diagnosis and treatment of disease affecting such systems;

(2)    the nature of asbestos and asbestos-related diseases;

(3)    the symptomatology, disease process and diagnosis of asbestosis and cancer associated with the respiratory system, peritoneum and peritoneal cavity;

(4)    the nature and extent of medical and scientific knowledge regarding any association of obstructive pulmonary disease with asbestos fiber exposure;

(5)    the effect of exposure to substances other than asbestos on the development and manifestation of obstructive and restrictive conditions and diseases of the respiratory system and other causes of obstructive and restrictive disease or defects of the respiratory system;

(6)     methods of diagnosis of various diseases, especially the means of establishing the differential diagnosis of alleged asbestos-related diseases with other non-asbestos-related diseases;

(7)     incidence of lung cancer among individuals with asbestosis or asbestos exposure as compared to non-asbestotic asbestos workers, non-asbestos exposed workers and to the general population;

(8)     cigarette smoking and its effects on the lungs and other organs;

(9)     the relationship of cigarette smoking to cancer of the lung and cancers of other body parts with reference to epidemiology studies and physiologic effect;

(10)    the difference between impairment and disability;

(11)    the effect of asbestosis or other asbestos-related disease, or asbestos exposure without asbestosis or other asbestos-related disease, on disability and life expectancy;

(12)    the lack of relationship between the presence of pleural plaques and a later development of any form of cancer;

(13)    the history of evolution and knowledge of asbestos related diseases;

(14)    the import of any exhibit introduced as evidence, or any items prepared for use or used for demonstrative purposed by any witness;

(15)    cancer incidence in the general population and among asbestos workers and its potential causes;

(16)    the incidence of mesothelioma among various kinds of workers exposed to asbestos, and the relative importance of various fiber types and the cause of mesothelioma; and

(17)    to the extent not covered above, asbestos medicine in general.

Dr. Andrew Churg
Department of Pathology
University of British Columbia
2211 Wesbrook Mall
Vancouver, BC V6T BS Canada
604/732-0186

Dr. Churg is Board Certified in Anatomic Pathology by the American Board of Pathology. Dr. Churg may provide testimony regarding his examination of plaintiffs' medical records and pathology material. Dr. Churg may also testify regarding the biological effects of asbestos and the evidence of the relationship between the inhalation of various forms of asbestos fibers and asbestos-associated disease and the factors that go into evaluating whether there is any medical risk from

asbestos-containing products. Dr. Churg may further testify regarding the physical and chemical changes that brake linings undergo during the braking process. Dr. Churg may further provide testimony based on biostatistics and his review and analysis of the epidemiological data and literature that brake mechanics and others are not at an increased risk to develop asbestos-related diseases as a result of their work on or around brakes and brake linings. Dr. Churg may also provide testimony regarding animal research concerning asbestos-related disease, the biological effects of asbestos and various other dusts, cancer research, the practices and protocols regarding publication of scientific research and the history of research into such matters in the United states and elsewhere including state of the art. Dr. Churg may also be asked to respond to the testimony from plaintiffs' experts regarding the alleged hazards of exposure to friction materials and their alleged propensity to release fibers.

The observations and opinions offered by Dr. Churg in this matter will be based on his review of the materials provided: a continuing review of the available scientific literature relating to the health effects of materials of interest in this matter and Dr. Churg's education and professional experience.

As Chrysler becomes aware of additional facts and the opinions of plaintiffs' experts, this witness may testify regarding his opinions of the additional facts or in response to the opinions of plaintiffs' experts.

Dr. Morton Corn
The Johns Hopkins University
Department of Environmental Health Sciences
Division of Environmental Health Engineering
615 North Wolfe Street, Room 6010
Baltimore, Maryland 21205
(410) 955-3602

Dr. Corn may testify, either live or by deposition, about the size, construction, layout and working environment of facilities such as where Plaintiff worked. Dr. Corn may testify about the nature of the working environment and the control and use of substances in such locations. He may testify about his knowledge of the composition and asbestos content, if any, of the products attributable to DaimlerChrysler by Plaintiffs, the ability of such products to emit asbestos fibers under certain conditions and the likelihood that Plaintiffs inhaled these fibers. He may testify regarding testimony given by Plaintiffs' experts regarding any industrial hygiene issue, including the OSHA regulations enforcement and practices. He may testify about industrial hygiene publications and literature from the 1940's to the present. He may also testify generally about the concept of dose-response, the evolution and use of threshold limit values and the knowledge that Plaintiffs' employers or other corporations, including DaimlerChrysler, had available to it during certain time periods. He may also testify regarding relative risk and OSHA risk models. He may testify as to any matter raised by experts called by Plaintiffs or any co-Defendants.

Dr. James D. Crapo
4650South Forest Street
Englewood, Colorado 80110
303/224-0681

Dr. Crapo is the Executive Vice President for Academic Affairs at the National Jewish Medical & Research Center in Colorado. Dr. Crapo may be called to testify with respect to medical condition and causation. Dr. Crapo may also testify with respect to the anatomy and function of the human respiratory system, pulmonary function testing, diseases allegedly associated with exposure to asbestos and the development of related scientific and medical knowledge. Dr. Crapo may further testify regarding the biological effects of asbestos and the evidence of the relationship between the inhalation of various forms of asbestos fibers and asbestos-associated disease and the factors to be considered in evaluating whether there is any medical risk from exposure to various asbestos-containing products. He may also provide testimony regarding animal research concerning asbestos-related disease, the biological effects of asbestos and various other dusts, cancer research, the practices and protocols regarding publication of scientific research and the history of research into such matters in the United states and elsewhere, including state of the art.

Dr. Crapo may further testify regarding radiology as a diagnostic aid in asbestos-associated disease as well as to his review and opinions of the radiographic findings and the correlation of those findings with plaintiff's medical records, work history and other diagnostic studies. Dr. Crapo may further provide testimony based on his review of the medical and scientific literature that brake mechanics and others are not at an increased risk to develop asbestos-related diseases as a result of their work on or around friction products.

Dr. Crapo may also be asked to respond to the testimony of certain plaintiffs' witnesses offered at the time of trial including, but not limited to, any testimony from plaintiffs' experts regarding the alleged hazards of exposure to friction materials and their alleged propensity to release fibers.

The observations and opinions offered by Dr. Crapo in any matter will be based on his review of the materials provided; a continuing review of the available scientific literature relating to the health effects of material of interest in this matter and Dr. Crapo's education and professional experience.

As a Chrysler becomes aware of additional facts and the opinions of plaintiffs' experts, this witness may testify regarding his opinions of the additional facts or in response to the opinions of plaintiff's experts.

William G. Hughson, M.D.
University of California at San Diego
LaJolla, California 92093
619/294-6001

Dr. Hughson is Board Certified in Internal Medicine and Pulmonary Medicine. Dr. Hughson may be called to testify with respect to the anatomy and function of the human respiratory system, pulmonary function testing, diseased allegedly associated with exposure to asbestos and the

-69-

development of related scientific and medical knowledge. Dr. Hughson may be called to testify with respect to medical condition and causation in these cases. Dr. Hughson may also be asked to respond to the testimony of certain witnesses offered at the time of trial including, but not limited to, testimony from plaintiffs' experts regarding the alleged hazards of exposure to friction materials and their alleged propensity to release fibers.

Dr. Hughson may further provide testimony based on his review of the medical and scientific literature that brake mechanics and others are not at an increased risk to develop asbestos-related diseases as a result of their work on or around brakes and brake linings.

Dr. Hughson may further testify regarding radiology as a diagnostic aid in asbestos-associated disease as well as to his review and opinions of the radiographic findings and the correlation of those findings with plaintiffs' or plaintiffs' decedents' medical records, work history and other diagnostic studies.

The observations and opinions offered by Hughson in this matter will be based on his review of the materials provided; a continuing review of the available scientific literature relating to the health effects of materials of interest in this matter and Dr. Hughson's education and professional experience.

As Chrysler becomes aware of additional facts and the opinions of plaintiffs' experts, this witness may testify regarding his opinions of the additional facts or in response to the opinions of plaintiffs' experts.

Ronald F. Dodson, Ph.D
Chairman, Department of Cell Biology and
Environmental Sciences
University of Texas Health Center at Tyler
Office of Associate Director of Research
P.O. Box 2003
Tyler, Texas 75710

Dr. Dodson is an expert in microscopy relating to pathology. If called, Dr. Dodson will testify regarding: (a) pathology studies, if any, relating to the Plaintiff; (b) matters relating to whether the Plaintiff has a condition or illness caused by asbestos exposure; and (c) matters relating to lung fiber deposition.

Sheldon H. Rabinovitz, Ph.D., C.I.H.
Sandler Occupational Medicine Associates
966 Hungerford Drive, Suite 20
Rockville, Maryland 20850
(301) 217-0092
(P.O. Box 7777, Melville, New York 11747)

Dr. Rabinovitz may be called to testify regarding mechanics' asbestos exposure conditions and health effects and the fact that mechanics are not exposed to levels of asbestos that result in any

disease. Dr. Rabinovitz may also testify regarding mechanics' lack of asbestos exposure as evidenced through testing concerning brake and clutch servicing.

> Eric J. Chatfield, Ph.D.
> Chatfield Technical Consulting Firms
> 2071 Dickson Road
> Mississauga, Ontario
> Canada L5B 1Y8

Dr. Chatfield is an Electron Microscopist who may testify, either live or by deposition, regarding air sampling and testing procedures for analysis by electron microscope. He may testify about differences among types of asbestos fibers and their characteristics and uses in various products. He may testify about tests done on various Westinghouse products and other asbestos containing products generally and specifically asphalt cement board a/k/a ebony board, and the content and ratios of the constituents of those products. He may testify about any matter raised by experts called by Plaintiffs or any co-Defendant.

> Robert N. Sawyer, M.D.
> Preventive Occupational Medicine
> 149 Prospect Avenue
> Guildford, CT 06437
> 203453-3060

Dr. Sawyer may be asked to evaluate the Plaintiff's experts' methodology and reports regarding various tests performed on allegedly asbestos-containing products. He may testify that plaintiffs experts methods are scientifically invalid and unreliable, not representative of any work the plaintiff(s) did, not pertinent to health effects on workers of work actually done. He may also testify about the characteristics of various fiber types, the products in which they are used and the way these fibers behave when disturbed, as well as the manner in which these fibers are encapsulated.

There is a lack of occupational history linking Plaintiff and any of this defendant's product exposures adequate to cause disease.

Dr. Sawyer may offer opinions regarding the evolution of the medical and scientific literature regarding asbestos' role, or lack thereof, in causing or contributing to a cause various diseases including asbestosis, pleural thickening and plaques, lung cancer, mesothelioma and other cancers such as gastrointestinal cancers, for example.

Dr. Sawyer may also offer opinions on the evolution of the standards regulating asbestos exposure from their establishment as early as 1938 (voluntary standards) and the first U.S. Government enacted regulations. Until OSHA was enacted in 1971 work-place regulations were the states' providence; some states adopted the TLV as state law, including Texas in 1958. He may also offer opinions and testimony regarding OSHA standards from OSHA's enactment on April 13, 1971 through the present day and how the permissible exposure levels (PEL) have evolved to the present day.

Dr. Sawyer may also offer opinions regarding the fact and reasonableness of industry's and specific companies' reliance upon the development of the scientific and medical literature regarding asbestos and disease.

Dr. Sawyer may also offer testimony in response to any issue discussed by plaintiffs experts in reports or testimony. His testimony may also include specific opinions related to this defendant's State of the Art issues, including corporate documents.

William H. Krebs, Ph.D.
Assistant Director, Occupational Safety and Health
General Motors Corporation
1014 Bishop Road
Grosse Point, Michigan
303/885-9039

Dr. Krebs has a degree in public health and has had training in epidemiology. He may be called to testify with regard to friction products which contain asbestos, forsterite, release of asbestos fibers during the braking process, testing of brake products, medical and scientific literature which addresses the listed topics, and threshold limit values.

Arnold E. Anderson
Tribo Diagnostic Corporation
P.O. Box 2008
Livonia, Michigan 48151
313/427-6507

Mr. Anderson has expertise in the composition, manufacture, use and wear characteristics of friction materials. He may be asked to testify concerning the following matters: (a) how a brake job is performed and the potential for dust exposure; (b) the science of tribology; (c) the types, characteristics and chemical properties of asbestos used in friction materials and their pathogenic potential; (d) the types, composition and manufacture of friction materials; (e) the history of friction materials, the use of asbestos in friction materials and the availability of substitutes for asbestos; (f) decomposition of asbestos in friction materials during the wear process; (g) the nature of residual materials after wear; and (h) the effects of wear debris in the occupational environment of workers where friction materials are used. If called, he is expected to testify concerning certain other aspects of and bases for these general areas of opinion relating to this cause, or other matters of fact regarding friction materials which because of their technical nature, may contain such opinions.

Graham W. Gibbs
14-51221 Range Road
265 Spruce Grove
Alberta, Canada  T7Y1E7
403/987-2883

Graham Gibbs has expertise in the areas of epidemiology, industrial hygiene, and toxicology, both generally and particularly as those areas relate to asbestos exposure and exposure to asbestos-

containing friction products. His opinions and the grounds for same include the following matters: (a) the types, characteristics and chemical properties of asbestos and their respective pathogenic potential; (b) the types, composition and manufacture of friction materials; (c) the history of friction materials, the use of asbestos in friction materials, and the lack of availability of suitable substitute materials for such use at relevant times; (d) decomposition of asbestos in friction materials during the wear process; (e) the composition of residual materials after wear does not include significant asbestos; (f) the effects of wear and the occupational environment of workers in which these products are used; (g) federal laws and regulations governing asbestos exposure; (h) threshold limit values and time-weighted averages; (i) characteristics and epidemiology of asbestos-related diseases, (j) relevant medical and scientific literature on these subjects; (k) the concepts of toxicity and hazard, including discussion of the human body's natural defense system; (l) dose response relationships; (m) potential for asbestos exposure in occupational settings; and (n) types, characteristics, and uses of various types of asbestos. He may also be called to testify concerning certain (i) other details relating to aspects of and bases for these areas of opinions relating to this action; or, (ii) other matters of fact which because of technical nature may contain some opinions.

John W. Kourik, P.E.
1136 Olivaire Lane
St. Louis, Missouri 63132
314/994-7857

Witness Kourik may be called to testify about the braking systems of various vehicles and state of the art information. He may also testify about developments in braking system design, manufacture and testing. He may testify further concerning the mechanics of friction products, braking system repair procedures and consumer expectations of braking systems and vehicle safety. Mr. Kourik may testify about the characteristics of chrysotile asbestos and its use in friction products as well as substitute and replacement materials for asbestos in friction products.

Edward E. Hester, Jr.
2201 North Glenbrook Drive
Garland, Texas 75040
(972) 675-0134

Edward Hester has worked as a mechanic for more than 20 years in Dallas, Texas and is currently an automotive repair instructor at Cedar Valley College. Mr. Hester has performed many brake and clutch repairs throughout his career. Mr. Hester may testify regarding all aspects of brake and clutch repair, the function of brakes and clutches and the known benefits of using asbestos in friction products. Mr. Hester may testify about the differences between OEM and after market brake shoes. Mr. Hester may demonstrate all aspects of brake and clutch repair work, including how to perform a drum and disk brake job, how to arc brake shoes and clean a wheel drum and backing plate. Mr. Hester may testify the minimal amount of dust created, if any, during brake and clutch repair. Mr. Hester may testify about the general working conditions in automotive garages.

He may respond to any testing by any fact or expert witness regarding the use, repair, manufacture for brakes, general practicing in garages, which was known about asbestos in the garage industry and when.

-73-

Bobby Unser
7700 Central Ave., SW
Albuquerque, NM 87121-2113
(281) 480-9847

Bobby Unser is a racecar driver, mechanic, and automobile dealership owner. He will offer testimony regarding automotive repair both in the racing and private industry. Mr. Unser has performed many brake and clutch repairs throughout his career. Mr. Unser may testify regarding all aspects of brake and clutch repair, the function of brakes and clutches and the known benefits of using asbestos in friction products. Mr. Unser may testify about the differences between OEM and after market brake shoes. Mr. Unser may demonstrate all aspects of brake and clutch repair work. Mr. Unser may testify regarding the minimal amount of dust created, if any, during brake and clutch repair. Mr. Unser may testify about the general working conditions in automotive garages in the racing and public industry. He may also testify about the availability and performance of non-asbestos containing friction products.

He may respond to any testing by any fact or expert witness regarding the use, repair, manufacture of brakes, general practices in garages, and what was known about asbestos in the racing and private industry and in the garage industry and when it was known.

Additionally, the experts listed above may testify regarding the lack of information regarding ill health effects of chrysotile asbestos used in friction products, state of the art and knowledge in the industry during the relevant time frame.

A copy of each identified individual's curriculum vitae is presently in the possession of Plaintiffs' counsel. If an additional review of such is necessary, same will be available for review at the office of counsel for Chrysler at a mutually convenient time.

Additionally, the experts listed above may testify regarding the lack of information regarding ill health effects of chrysotile asbestos used in friction products, state of the art and knowledge in the industry during the relevant time frame.

A copy of each identified individual's curriculum vitae is presently in the possession of Plaintiffs' counsel. If an additional review of such is necessary, same will be available for review at the office of counsel for Chrysler at a mutually convenient time.

54.    Please state the name and last known address of each expert witness who is not

retained or employed for the purpose who is an employee of Defendant and will render an opinion

within his expertise at the time of trial.

ANSWER: See response and objections to Interrogatory No. 53.

-74-

55.    Does Defendant admit that service of process was properly had on it in these cases? If not, please state why.

ANSWER: Chrysler does not contest service at this time.


55.1    For each and every affirmative defense asserted in the answering defendant's Answer to Plaintiff's Complaint, the Cross-Claims or Counter-Claims of any party against this answering defendant state:

- (a)    the facts upon which the answering defendant relies for each and every affirmative defense;

- (b)    each and every document which will be offered to prove each and every affirmative defense;

- (c)    each and every witness who will testify in support of each and every affirmative defense; and

- (d)    the substance and subject matter of the anticipated testimony of each witness identified in the preceding response.


ANSWER: Chrysler has raised numerous affirmative defenses which, if not raised in its answer, are deemed to be waived. Chrysler states further that investigation through discovery is ongoing with respect to the affirmative defenses raised in its answer and that, prior to trial, it will notify the Court of any affirmative defenses which it does not seek to establish by way of proof at trial.


56. Does Defendant have policies of insurance that might cover the claims that have been

-75-

made the Plaintiffs herein?

ANSWER: Chrysler is presently self-insured and has been self-insured subsequent to 1972. Chrysler was insured by the Hartford Insurance Company from 1926 through 1972. There were separate policies for each year.


56.1 Have you ever been involved in any litigation concerning potential insurance coverage of asbestos products matters? If so, please state:

    (1)    the case caption, court and date of filing each case in which you have been involved;

    (2)    whether you were plaintiff or defendant;

    (3)    (4)    a brief statement of the issues;

    (5)    identify by date, author and recipient(s), (including recipients of carbon copies) all documents listed as exhibits by either party in this litigation;

    (6)    identify by deponent and date all individuals who were deposed in these cases;

    (7)    identify by date, author and recipient(s) all documents that have been placed on a protective order in such litigation;

    (8)    identify all expert witnesses retained for use at trial in any of the above litigation by name, address and telephone number.

ANSWER: Chrysler objects to this Interrogatory on the basis that it seeks information not reasonably calculated to lead to the discovery of admissible evidence.


57. Please state the name and address of each person who has knowledge of relevant facts regarding claims and defenses of this lawsuit.

ANSWER: To the extent not previously listed in response to these Interrogatories, Chrysler believes

Plaintiff and all witnesses listed by Plaintiff have relevant knowledge.

58.    State the last date that this Defendant sold, distributed, manufactured, installed, used and/or otherwise placed asbestos-containing products into the stream of commerce.

ANSWER: See response to Interrogatory No. 5.


59.    Please state the geographical limit, if any, by state in which you conducted business for the manufacture, sale, distribution, use or installation of asbestos or asbestos-containing products. If you had discrete geographical limits within a state, please state the county or counties in which you conducted business for that particular state of states.   If there were time limitations for such geographical limitations, please state the time period for each geographical location.

ANSWER:   Chrysler understands that Plaintiffs allege they were exposed to asbestos from automotive friction products and Chrysler's response to this interrogatory is limited to those products. Chrysler has manufactured and sold automobiles and light trucks throughout the United States since 1925.

As to objections.

_____

REMINGER & REMINGER CO., L.P.A.


_____

MATTHEW C. O'CONNELL (0029043)
The 113 St. Clair Building
Cleveland, Ohio 44114
(216) 687-1311

Attorney for Defendant
DaimlerChrysler

-77-

## CERTIFICATE OF SERVICE

The foregoing Responses to Plaintiffs' First Master Set of Interrogatories to All Above Named Defendants was filed via CLAD this 30thth day of November 2000.

_____

MATTHEW C. O'CONNELL  (0029043)